[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 04-12465

_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
AUGUST 12, 2005
THOMAS K. KAHN
CLERK

D. C. Docket No. 02-80527-CV-KLR

SEB S.A.,

Plaintiff-
Appellee,

versus

SUNBEAM CORPORATION,
SUNBEAM PRODUCTS, INC.,

Defendants-

Cross-Claimants-
Third-Party

Plaintiffs-
Appellants-
Cross-Appellees,

WING SHING INTERNATIONAL, LTD. (BVI),

Defendant-

Counter-Claimant-
Third-Party

Defendant,
Appellee,

PENTALPHA ENTERPRISES, LTD.,

Defendant-
Counter-Claimant-
Third-Party
Defendant-
Appellee-
Cross-Appellant,

GLOBAL-TECH APPLIANCES, INC.,

Counter-Claimant-
Third-Party
Defendant-
Appellee-
Cross-Appellant.

_____

Appeals from the United States District Court
for the Southern District of Florida
_____

**(August 12, 2005)**

Before BIRCH, CARNES and HILL, Circuit Judges.

BIRCH, Circuit Judge:

This appeal presents a number of issues arising from a Product Supply

Agreement entered into by Pentalpha Enterprises, Ltd. ("Pentalpha"), and Sunbeam

Products, Inc. ("Sunbeam Products"). Sunbeam Products and its parent company,

Sunbeam Corporation, Inc. (collectively, "Sunbeam"), sued Pentalpha and its

2

parent company, Global-Tech Appliances, Inc. ("Global-Tech"), for indemnification. Pentalpha brought a crossclaim against Sunbeam and alleged breach of contract and fraudulent inducement. After a trial in district court, a jury awarded Sunbeam $2,450,948.91 on its indemnification claims against Pentalpha and Global-Tech and Pentalpha $6,600,000 on its breach of contract claim against Sunbeam. On appeal, Sunbeam argues that the district court erred in refusing to grant it judgment as a matter of law on Pentalpha's breach of contract claim and in declining to order a new trial because of the admission of allegedly improper testimony. On cross-appeal, Pentalpha argues that the district court erred in denying Pentalpha pre-verdict interest on its breach of contract award, in admitting certain evidence which could have resulted in increased damages for Pentalpha, and in denying Global-Tech judgment as a matter of law on Sunbeam's breach of contract claim. We **AFFIRM** in part, **REVERSE** in part, and **REMAND** for proceedings consistent with this opinion.

## I. FACTUAL BACKGROUND

Global-Tech, formerly named Wing Shing International, (BVI) Ltd. ("Wing Shing"),[1] is a publicly-traded holding company incorporated in the British Virgin Islands. Global-Tech is the parent company of Pentalpha. Pentalpha is based in

---

[1] Global-Tech changed its name from Wing Shing International (BVI) Ltd. in 1997. For clarity, we refer to the entity as Global-Tech throughout this opinion.

3

Hong Kong and designs, manufactures, and sells household appliances for resale to retail customers. Pentalpha Enterprises U.S., Inc. ("Pentalpha U.S."), was owned by Eyal Lior and Joe Sasso in 1997.

Sunbeam Products, Inc., a company located in Boca Raton, Florida, sells household appliances. In the early 1990s, Pentalpha began selling certain small household appliances to Sunbeam, who then resold the appliances to retail customers.

A.    The June Product Supply Agreement

Pentalpha, Pentalpha U.S., Wing Shing Marketing (BVI) Ltd.,[2] and Sunbeam entered into a Product Supply Agreement ("June PSA") dated 27 June 1997. Lior, part owner of Pentalpha U.S., negotiated the June PSA on behalf of Pentalpha, Pentalpha U.S., and Wing Shing Marketing.

Under the terms of the June PSA, Pentalpha became the exclusive supplier for Sunbeam of certain appliances, listed in Schedule A to the PSA, "so long as Sunbeam continues to market similar or like products of the type listed in Schedule A . . . ." R4-201, Exh. 103 ¶ 2. Sunbeam did not guarantee "to purchase any specific quantity of product at any time." Id. As long as Sunbeam gave Pentalpha ninety days notice, Sunbeam could change or discontinue its product line so that it

_____

[2] Wing Shing Marketing dissolved at the end of 1997.

4

would not need to purchase any appliances from Pentalpha.

The June PSA also provided a process by which Pentalpha would begin manufacturing for Sunbeam any Schedule A products that it did not already manufacture:

> All items not currently being manufactured by Pentalpha will be quoted by Pentalpha as soon as possible. If the quoted prices from Pentalpha are equal to or lower than Sunbeam's existing pricing, a project will be started to move tooling from the current supply source to Pentalpha no later than by April 1, 1998. Sunbeam and Pentalpha agree that time is of the essence and will strive to move as much tooling as possible before the Chinese New Year holiday. If Sunbeam does not own the tooling, Pentalpha will begin new tooling construction when pricing is agreed upon.

Id. ¶ 3.B. The June PSA did not explicitly require Sunbeam to provide to Pentalpha specifications or samples of Schedule A Products that Pentalpha did not already manufacture. Further, the June PSA did not explicitly require Pentalpha to provide project plans to Sunbeam before the transfer of tooling could take place.

Additionally, the June PSA provided that "Pentalpha's supply rights and Sunbeam's purchase requirements obligation" were subject to "Pentalpha's continued delivery of product in accordance with all terms and conditions of Sunbeam's purchase orders for product and product specific manufacturing and distribution agreements." Id. ¶ 2. The parties agreed that the law of Florida would

5

govern the June PSA. Id. ¶ 5. The term of the June PSA ran from 1 July 1997 to 30 June 2001. Id. ¶ 1.

A Rider to the June PSA, signed only by Lior, President of Pentalpha U.S., "supplement[ed] the Product Supply Agreement dated June 27, 1997 by and between Sunbeam Products, Inc. and Pentalpha Enterprises US, Ltd." R4-201, Exh. 104 ¶ 1. It specified that "Pentalpha" would pay Sunbeam a rebate of one million dollars "in consideration of the exclusive supply commitments contained in" the PSA. Id. ¶ 2. At trial, John Sham, CEO of Pentalpha and Global-Tech, testified that he did not see the Rider to the agreement until October 1997 and that Lior did not have the authority to commit Pentalpha to pay a one million dollar rebate to Sunbeam.

B. The October Product Supply Agreement

In October 1997, George Timchal, Vice President of Procurement at Sunbeam, told Sham that the June PSA contained the Rider. Sham was "kind of shocked" and "not happy," and after discussions with Global-Tech's investment bank, concluded that the supply agreement had to be changed. On 22 October, Sham met with Sunbeam's representatives to discuss the one million dollar rebate and other matters. At the meeting, Sham and Sunbeam's representatives discussed entering into a new Product Supply Agreement between Pentalpha and Sunbeam

6

Products, Inc.  Under the agreement proposed by Sunbeam, Pentalpha would give Sunbeam a one million dollar rebate immediately.  Sham was initially reluctant to enter into the agreement, but after Timchal and other Sunbeam representatives indicated to Sham that Sunbeam was a strong, growing company, Sham decided to sign it on behalf of Pentalpha.

On 23 October 1997, Sham executed the revised Product Supply Agreement ("October PSA") on behalf of Pentalpha.  The October PSA, entered into between Pentalpha and Sunbeam Products, Inc.,  differed from the June PSA in two main ways.  First, the October PSA contained the million dollar rebate provision, which had been in a rider to the June PSA, in its main body.  Second, the October PSA included a merger clause.  The provisions of the October PSA and June PSA were identical in all other respects.  The term of the October PSA was 1 July 1997 to 31 June 2001.  Additionally, Sunbeam and Pentalpha  executed an agreement which stated that "Sunbeam accepts and agrees that the [June PSA] was never effective and that it is of no force or effect."  R4-201, Exh. 113 ¶ 2.

C.    Pentalpha and Sunbeam's Conduct Under the October PSA

On 28 October 1997, Pentalpha submitted bids to Sunbeam on 27 Schedule A products models, including certain coffee-makers, garment steamers, irons, rice cookers, and rotisserie ovens.  Pentalpha did not bid on the air filters, toaster

7

ovens, hand mixers, ultrasonic humidifiers, or other coffee-makers listed in Schedule A. According to Sham's testimony at trial, Pentalpha did not bid on the air filters, coffee makers, or toaster ovens because it could not meet Sunbeam's existing prices. Pentalpha did not bid on the hand mixers because Sunbeam did not provide Pentalpha samples of those items. Pentalpha did not bid on the ultrasonic humidifiers because Sunbeam informed Pentalpha that they had been discontinued. Sham testified that Pentalpha needed the samples to determine the products' specifications with certainty.

Sunbeam did not respond to Pentalpha's bids on irons. Sunbeam responded to its bids on rice cookers only by communicating that the bid was higher than a bid Pentalpha had submitted in 1996 on a different model of rice cooker. Sunbeam accepted Pentalpha's bids for a series of coffee makers identified on Schedule A, two models of garment steamers, and rotisserie ovens. However, Sunbeam never transferred tooling for these items.[3] On 16 March 1998, Pentalpha

---

[3] According to Sunbeam, it did not order the series of coffee makers from Pentalpha because Pentalpha failed to "submit a project plan that met the minimum criteria for a reasonable transfer of those products." R9 at 174. On 24 December 1997, Nugent sent a memorandum to Pentalpha which stated that, for the coffee makers, "Pentalpha needs to provide project plan and provide Sunbeam with UL/CUL approval plan (dates) as well. . . . We will agree to a tooling transfer date that fits in with your project plan." R4-201, Exh. 127 at 1. Pentalpha responded on 30 December 1997: "Yes, you are right, we need to prepare a UL samples [sic] for approval under Pentalpha's name. . . . But, we still need your tooling. Otherwise, no sample (manufactured by Pentalpha) for UL approval." R4-201, Ex. 128 at 1. In its response, Pentalpha included a schedule indicating that the tooling for the coffee makers should have been transferred completely by 28 February 1998.

8

submitted lower bids on the rice cookers.  Sunbeam did not respond to the renewed bids.

D.     Sunbeam's Indemnification Claims Against Pentalpha

At some point during Sunbeam's relationship with Pentalpha, the Rival Company ("Rival") filed a lawsuit against Sunbeam and asserted that a food steamer manufactured by Pentalpha for Sunbeam infringed Rival's patent.  Soon after, Black & Decker, Inc. ("Black & Decker") filed a lawsuit against Sunbeam. Black & Decker similarly claimed that a food steamer manufactured by Pentalpha for Sunbeam infringed Black & Decker's patent.  On 5 February 1998, Sunbeam wrote to Pentalpha and demanded reimbursement of approximately $850,000 of legal fees spent defending successfully the Rival and Black & Decker lawsuits. Sunbeam stated that "[e]ffective today there will not be any communications from Sunbeam to Pentalpha on any issues on ongoing business until such time as you personally contact Sunbeam to resolve the litigation expenses."  R9 at 12. According to the parties' pre-trial stipulations, Pentalpha did not deny its responsibility to reimburse Sunbeam but rather "questioned the amount and nature of the expenditures."  R9 at 20.

E.     Sunbeam's Solicitation of Rebates from Other Manufacturers

In 1997, Sunbeam solicited and received a $240,000 rebate from Tsann

9

Kuen, its existing supplier of Schedule A hand mixers. In March 1998, Tsann

Kuen offered Sunbeam a one million dollar rebate in response to a request from

Sunbeam. Sunbeam also solicited a one million dollar rebate from Chiaphua

Industries, Ltd., another supplier. Sunbeam attempted to secure rebates from

other suppliers but was unsuccessful.

F.     Pentalpha's 16 July 1998 Memorandum

On 16 July 1998, Pentalpha wrote to Sunbeam and asserted that Sunbeam

had not fulfilled its obligations under the PSA:

> Since the agreement has not been fulfilled by
> Sunbeam, our auditor has forced Pentalpha to write off
> the paid deposit, one million US dollars.
>      We have no choice but to issue the debit note to
> Sunbeam for this one million. Please kindly
> acknowledge by fax return. The original will be sent to
> you and you're [sic] A/C department by FedEx.

R4-201, Ex. 152 at 1. Attached to the memo was a debit note from Pentalpha to

Sunbeam for one million dollars. According to Sham, Sunbeam did not respond

to the 16 July 1998 memo.

## II.  PROCEDURAL BACKGROUND

On 10 March 1998, SEB, S.A. ("SEB"), a French corporation, initiated an

action in district court[4] and claimed that a deep fryer manufactured by Pentalpha

---

[4] SEB commenced the action in United States District Court for New Jersey. The action was later transferred to the Southern District of Florida.

for Sunbeam infringed SEB's patent. In its amended complaint, SEB named Sunbeam, Global-Tech, and Pentalpha as defendants. Sunbeam asserted a third-party claim and cross-claim against Pentalpha and Global-Tech for indemnification.

The district court dismissed SEB's amended complaint against Global-Tech and Pentalpha for lack of personal jurisdiction, and around July 1998, SEB and Sunbeam settled for $2 million. In its amended complaint, Sunbeam claimed rights to indemnification from Pentalpha and Global-Tech for costs arising from prior litigation over the Rival and Black & Decker food steamer patents and for the SEB litigation and settlement. Pentalpha asserted counterclaims against Sunbeam for breach of contract and fraudulent inducement.

A. Summary Judgment

Sunbeam moved for summary judgment on its indemnification claims and Pentalpha's fraudulent inducement and breach of contract counterclaims. The district court granted Sunbeam's motion in part. First, the district court granted Sunbeam's motion for summary judgment as to Pentalpha's liability to indemnify Sunbeam for attorneys' fees from the Rival and Black & Decker food steamer litigation but denied the motion as to the amount of damages. The district court noted that Pentalpha conceded its obligation to indemnify Sunbeam but concluded

11

that there existed material issues of fact as to the amount of fees owed. Second, the district court granted Sunbeam's motion as to Pentalpha's liability to indemnify Sunbeam for the SEB settlement but denied summary judgment as to damages. Again, there existed material issues of fact as to the amount of Sunbeam's attorneys' fees. The district court held that Pentalpha's obligation to indemnify Sunbeam arose out of U.C.C. § 2-312(3) and was thus independent of Sunbeam's purchase orders or the October PSA. Third, the district court granted Sunbeam's motion as to Pentalpha's fraudulent inducement claim. Finally, the district court ruled that there existed material issues of fact as to which party breached the PSA first and denied Sunbeam's motion as to Pentalpha's breach of contract claim. The case proceeded to trial.

B.    The District Court's 15 December Order

Before trial, on 14 November 2003, Sunbeam filed a motion in limine to exclude any evidence of Sunbeam's receipt of rebates from vendors other than Pentalpha ("rebate evidence") from 1997to 1999. Sunbeam argued that Pentalpha offered the rebate evidence to prove Sunbeam's motive in allegedly breaching the October PSA. The district court ruled that the rebate evidence was admissible for two purposes. First, any rebate evidence which showed that Sunbeam committed a material breach of the October PSA was admissible. Pentalpha could offer, for

12

example, evidence relevant to a claim that Sunbeam could not perform under the October PSA because, in accepting a particular rebate, it became contractually bound to another vendor. Second, Pentalpha could introduce rebate evidence to rebut any explanation offered by Sunbeam of its failure to perform under the agreement. The rebate evidence could not be admitted for any other purposes.

C.     The District Court's 17 December Order

On 14 November 2003, Pentalpha moved to preclude Sunbeam from offering evidence that Pentalpha breached the October PSA by failing to indemnify Sunbeam for the SEB litigation and settlement and Rival and Black & Decker food steamer lawsuits. Pointing to the merger clause in paragraph 8 of the October PSA, Pentalpha argued that the October PSA did not require indemnification. In response, Sunbeam contended that paragraph 2 of the October PSA required indemnification because it incorporated into the PSA the terms of Sunbeam and Pentalpha's purchase orders and manufacturing and distribution agreements, both of which required indemnification. The district court agreed with Sunbeam. It held that Paragraph 2 of the October PSA incorporates the terms and conditions of the purchase orders, which required Pentalpha to indemnify Sunbeam for the SEB litigation and settlement, and the terms and conditions of the manufacturing and distribution agreements, which required

13

Pentalpha to indemnify Sunbeam for the Rival and Black & Decker food steamer litigation attorneys' fees. Accordingly, the district court ruled that evidence concerning Pentalpha's failure to indemnify Sunbeam for the SEB litigation and settlement and Rival and Black & Decker food steamer lawsuits was admissible to prove prior breach by Pentalpha.

D.    Trial

1.    Sunbeam's Case-in-Chief

Trial began on 12 January 2004. In its case in chief on its indemnification claims, Sunbeam called Steven Berreth, the former intellectual property counsel of Sunbeam Corporation; John Sham, the CEO of Global-Tech and Pentalpha; Donald Jackson, a former employee in Sunbeam's accounting department; and Peter Howell, a Director of Global-Tech.

2.    Global-Tech's Motion for Judgment as a Matter of Law

Global-Tech moved for a directed verdict after Sunbeam had called all of its witnesses. Global-Tech argued that Sunbeam had offered no evidence showing that Global-Tech should be held directly liable for indemnification. The district court denied Global-Tech's motion:

> [W]ith a complicated structure like that I'm not going to grant that motion. We may revisit this issue again, but it's very clear even from their own filed statement that they're making it very hard for anybody to sue them and get jurisdiction. They've got all these

14

> different companies. I don't know how anybody dealing with them is supposed to know which company to deal with. In fact, they even sell the same product through different companies.
>
> . . . I'm not letting anybody out at this time. Maybe later on, but not at this time.

R8 at 199. Pentalpha did not renew this motion at the close of all of the evidence.

3.     Pentalpha's Defense and Case-in-Chief

In defense of Sunbeam's indemnification claims, and in its case in chief on its breach of contract claim, Pentalpha called seven witnesses, including George Timchal, Sunbeam's former Vice president of Procurement; John Sham; James Nugent, Sunbeam's Vice-President of Asian Sourcing Operations; David Wiggins, Sunbeam's Rule 30(b)(6) witness; and Glenn Newman, Pentalpha's forensic accountant.

a.     Pentalpha's Rebate Evidence

Before Wiggins's deposition was read, Sunbeam argued that Wiggins's testimony was inadmissible under the district court's 15 December order and urged the district court to prevent Pentalpha from calling him. In response, Pentalpha contended that Wiggins's testimony would (1) create an inference that Sunbeam breached the October PSA in soliciting and accepting rebates from Schedule A product vendors with the understanding that Sunbeam would give them additional business in return and (2) rebut Sunbeam's contention that it did

15

not buy Schedule A products from Pentalpha because of Pentalpha's failure to create proper project plans or prior breach of the PSA. Sunbeam replied that Wiggins's testimony did not provide evidence that Sunbeam committed to buy Schedule A products from another vendor. The court allowed the testimony because "it ha[d] some bearing and under proper instructions the jury [would] resolve it." R10 at 12-13.

Wiggins testified to the following facts concerning the rebate evidence. In 1997, Sunbeam solicited and received a rebate of $240,000 from Tsann Kuen. The rebate was a volume rebate for purchases made in 1997 and had "no future commitments [by Sunbeam or Tsann Kuen] tied to [it]." Id. at 44. However, Wiggins stated that he did not believe, but did not know with certainty, whether "there was any wink or nod between the person who negotiated [the rebate] on behalf of Sunbeam and the person who negotiated it on behalf of Tsann Kuen that, 'if you paid this rebate we are going to do our best to treat you right in the future.'" Id. at 50-51.

In March 1998, Tsann Kuen offered Sunbeam a one million dollar rebate in response to a request from Sunbeam. Sunbeam later reversed the rebate. In March 1998, Sunbeam also solicited a one million dollar rebate from Chiaphua Industries, Ltd., another supplier. Wiggins stated that he believed that the rebate

16

was given in connection with a defective product manufactured for Sunbeam by Chiaphua. Additionally, Sunbeam unsuccessfully attempted to secure rebates from other suppliers. For example, Sunbeam possibly attempted to secure a rebate from Simatlex, another manufacturer.

After a recess, Sunbeam renewed its objection to Wiggins's testimony. Arguing that Wiggins's testimony revealed that "there was no double dipping" by Sunbeam, that Sunbeam had decided that rebates were "bad business," and that there were no supply agreements or commitments associated with any of the rebates, Sunbeam contended that his testimony was irrelevant. Id. at 81. The district court declined to strike Wiggins's testimony and stated that Sunbeam could argue the relevance of Wiggins's testimony to the jury.

b.      Pentalpha's Damages Evidence

During discovery, Sunbeam produced data from its computer system ("the computer printouts") which, according to Sunbeam, showed all of its its purchases of Schedule A Products for resale from vendors other than Pentalpha during the term of the PSA. At trial, Pentalpha attempted to offer into evidence testimony and documents which purportedly demonstrated that the computer printouts were incomplete and underrepresented Sunbeam's Schedule A purchases from other vendors.

17

First, Pentalpha offered the expert testimony of Glenn Newman, Pentalpha's forensic accountant. According to Pentalpha, Newman "ha[d] the expertise to analyze [the data provided by Sunbeam] and break it into parts and compare it to other pieces of data and form an opinion with a reasonable degree of professional certainty about whether or not that data which has been produced is complete or incomplete." R10 at 141. The district court refused to allow Newman's testimony. The court concluded that the jury could determine the completeness of the data without Newman's assistance. The court advised Pentalpha's counsel that he could "argue that [the data] is not complete and you can bring in any witnesses you want – factual witnesses regarding the completeness of it, but I am not going to let an expert testify to that." Id. at 143.

Second, Pentalpha offered the affidavit of Alan LeFevre, Sunbeam's Chief Financial Officer, marked as Trial Exhibit 156, and a chart, marked as Trial Exhibit 182I. In the affidavit, LeFevre testified that he understood that, "from the years 1998 to 2000, Sunbeam's total domestic [h]ousehold manufacturing purchases remain[ed] relatively steady." R4-201, Ex. 156 at 1 ¶ 2. Trial Exhibit 182I compared the total number of household products purchased by Sunbeam, according to data provided in LeFevre's affidavit, with Sunbeam's purchases of Schedule A products, according to data in the computer printouts. R10 at 175;

18

R4-201, Ex. 182I. Pentalpha's counsel contended that he could reasonably argue that the significant increase in Sunbeam's purchases of Schedule A products from 1998 to 2000, as represented by the computer printouts, did not make sense when viewed in light of Sunbeam's relatively stable purchases of other household appliances. The court stated that the conclusions Pentalpha wished to draw from the graph and affidavit were "wildly speculative" and refused to admit the evidence. R10 at 179.

Third, Pentalpha offered two more graphs prepared by Newman. The first, Trial Exhibit 182J, was a graphical representation of Sunbeam's purchases for the first five months of 1997, 1998, 1999, 2000, and 2001, based on the data in the computer printouts. R4-201, Ex. 182J. Pentalpha's counsel stated that the graph helped suggest that the data provided by Sunbeam was incorrect because the data showed that no purchases of Schedule A products were made in the first five months of 1999. The court ruled that Exhbit 182J was inadmissable. It concluded:

> [W]ithout any further indication, if you have a witness from Sunbeam who is going to come in and say, "You know, we gave them phony figures, and I know that we are ordering during that period[] of time," you might have some basis for it.
> But without any testimony to the contrary – I mean, all of this deals with circumstantial evidence that the Eleventh Circuit has said on [a] number [of] occasions that when a witness comes in and testifies something is thus and so, you can't draw circumstantial

19

evidence to the contrary.

I mean, I thought it was a rather astounding statement from the Court of Appeals . . . I even wrote an opinion saying that the Court of Appeals [] now . . . has inconsistent opinions with regard to whether it is an employee discrimination case or whether it is an SEC case. But I will assume that their last pronouncement is the one that they intend to follow, and that if somebody denies that that is true unless you have evidence to the contrary you can't make circumstantial evidence to the contrary.

R10 at 182.

The second, Trial Exhibit 182K, was a chart comparing the number of Sunbeam vendors from 1 July 1997 to 8 May 1999 to the number of Sunbeam vendors from 9 May 1999, when Sunbeam converted its computer system, to 9 August 1999. According to Pentalpha's counsel at trial, the chart showed that the number of vendors increased two or threefold during the thirty day period after 9 May 1999, which in turn suggested that Sunbeam's data was incorrect. Id. at 183. The district court refused to admit Trial Exhibit 182K because it was "not proper evidence to establish [Pentalpha's conclusion]." Id. at 183-84.

4.      Sunbeam's Motion for a Judgment as a Matter of Law

At the close of Pentalpha's case in chief, Sunbeam moved for a judgment as a matter of law as to Pentalpha's breach of contract claim. Sunbeam argued that Pentalpha had presented no evidence by which a reasonable jury could conclude that Sunbeam breached the PSA before Pentalpha. According to Sunbeam, the

evidence showed that Pentalpha breached the PSA by (1) failing to bid on all the Schedule A products, as required by paragraph 3.B in the October PSA, and submit project plans; and (2) failing to indemnify Sunbeam for its food steamer patent infringement expenses. In support of its indemnification argument, Sunbeam cited the district court's 17 December order which concluded that the PSA incorporated manufacturing and distribution agreements requiring Pentalpha to indemnify Sunbeam for those expenses. The district court denied Sunbeam's motion.

5.  Pentalpha's Closing Argument

In his closing argument, counsel for Pentalpha argued:

> [W]ith respect to the hand mixers . . . . Sunbeam also breached the supply agreement by telling its existing supplier of the hand mixers, that's the company in Asia called Tsann Kuen, that it could keep that existing business either through its conduct or through its words if it paid Sunbeam a $240,000 rebate
>
> . . . .
>
> Now, we need to put two and two together. Pentalpha never got a sample. Tsann Kuen paid a rebate and got some wink and nod agreement from Sunbeam. Would Tsann Kuen [have] paid a rebate just because Sunbeam are nice people? Doubt it. They are getting something going forward.
>
> Then back in March of 1998, there [are] documents showing that Tsann Kuen paid another one million dollar rebate to Sunbeam. Mr. Nugent didn't tell us that in his deposition, but the testimony of Sunbeam's representative is really clear. These other vendors are paying these rebates because they think they are getting something in return. What they are getting is, is more business, and that starts with keeping their old business.

21

Is there really any doubt that to obtain a rebate from Tsann Kuen Sunbeam promised Tsann Kuen that it could keep its existing hand mixer business.

R11 at 104-05. Later in his closing argument, Pentalpha's counsel responded to Sunbeam's arguments that Pentalpha breached the October PSA in failing to bid on certain Schedule A products. He explained that Pentalpha did not bid on the toaster ovens, coffee markers, and air filters because it could not submit a competitive bid. Next, he stated that Pentalpha did not bid on a certain model of hand mixer and an ultrasonic humidifier because Sunbeam indicated to Pentalpha that the product was obsolete. He then argued:

> What was really going on was that Sunbeam was discouraging Pentalpha from bidding. If Sunbeam wanted a bid on the hand mixers it would have sent Pentalpha a sample of the hand mixers.
> I guess it was too busy soliciting its rebate from its existing supplier of hand mixers, Tsann Kuen.

Id. at 117.

In his rebuttal, Pentalpha's counsel again mentioned the rebates:

> Now, the only important event that [Sunbeam's counsel] notes on his time line [of events] is the memorandum of Mr. Nugent saying, "You didn't bid on this. Where is your project plan?" Communications. That's it.
> [Sunbeam's counsel] does not attempt to demonstrate that Sunbeam did anything to perform the contract. Didn't move any tooling. Didn't try to move – didn't try to move any other tooling. But, boy, was it good at hitting up its other suppliers for rebates. What would have happened if it told its existing suppliers that they were going to have to transfer their tooling to Pentalpha? You think

22

> they would have gotten a rebate out of Tsann Kuen? Think they would have gotten a rebate out of Chiaphua?

Id. at 157-58.

6.    The Verdict and Judgment

On 16 January 2004, the jury returned its verdict. The jury awarded Sunbeam $2,450,948.91 against Pentalpha and Global-Tech on its claims for indemnification. R12 at 3. Additionally, the jury found that "Pentalpha and Global-Tech [wer]e alter-egos of each other," id.; "Sunbeam failed to perform its material obligations under the terms of the supply agreement," id.; Sunbeam's failure to perform its obligations was not excused, id. at 3-4; the parties did not abandon the PSA, id. at 4; and Sunbeam did not prove by a preponderance of the evidence that the 16 July 1998 memo constituted a termination of the October PSA, id. The jury awarded Pentalpha damages of $6,600,000 against Sunbeam on its breach of contract claim. Id.

On 27 January 2004, Pentalpha moved for entry of judgment based upon the jury's verdict and prejudgment interest of $2,485,299, calculated from 1 January 1999. Sunbeam opposed Pentalpha's interest calculation and argued that, under Florida law, prejudgment interest could not be awarded without a "fixed date of loss," which was not provided by the jury's verdict. Pentalpha replied that Florida law allowed the district court to examine the evidence to determine the

23

date of loss and award prejudgment interest accordingly. Pentalpha provided the district court with four methods of determining when prejudgment interest should begin.

On 11 February 2004, the district court entered final judgment. It awarded Sunbeam $979,744.90 in prejudgment interest and Pentalpha $32,909.59 in interest. R3-166 at 5. The district court refused to award Pentalpha interest before the 16 January 2004 verdict because it concluded that it could not ascertain conclusively an exact date on which Pentalpha sustained its damages.

E.    Sunbeam's Post-Trial Motions

Following trial, Sunbeam renewed its motion for judgment as a matter of law. Alternatively, Sunbeam moved for a new trial. The district court denied Sunbeam's motions.

F.    Claims on Appeal and Cross-Appeal

On appeal, Sunbeam advances three main arguments. First, Sunbeam argues that the district court erred in denying Sunbeam's motion for judgment as a matter of law because Pentalpha breached the PSA first by failing to indemnify Sunbeam. Second, Sunbeam argues that the district court erred in denying Sunbeam's motion for judgment as a matter of law because Pentalpha's 16 July 1998 memorandum to Sunbeam constituted either a breach of a dependent covenant in the October PSA, which freed Pentalpha of its contractual obligations,

24

or a binding election of the remedy of rescission which foreclosed Pentalpha from suing for damages for breach. Third, Sunbeam argues that the district court erred in denying its motion for a new trial because the district court erroneously admitted rebate evidence in violation of its 15 December order.

On cross-appeal, Pentalpha asserts four arguments. First, Pentalpha contends that the district court erred in refusing to award Pentalpha pre-verdict interest on its breach of contract award. Second, it argues that the district court erred by excluding Pentalpha's circumstantial evidence that Sunbeam had purchased more products from other suppliers in breach of the PSA than represented by Sunbeam's computer printouts. Third, Pentalpha avers that the district court erred in granting summary judgment on Pentalpha's fraudulent inducement claim because Pentalpha could have relied justifiably on Sunbeam's misrepresentations as to its financial condition. Finally, Pentalpha and Global-Tech contend that the district court erred in denying Global-Tech's motion for a directed verdict because Sunbeam did not produce sufficient evidence to prove that Global-Tech is Pentalpha's alter ego.

## III.  DISCUSSION

A.     Sunbeam's Renewed Motion for Judgment as a Matter of Law

We review de novo the district court's denial of a motion for judgment as a matter of law. Brochu v. City of Riviera Beach, 304 F.3d 1144, 1154 (11th Cir.

25

2002). We view all facts in the light most favorable to the nonmovant, and we recognize that "[i]t is the jury's task– not ours–'to weigh conflicting evidence and inferences, and determine the credibility of witnesses.'" Id. (citation omitted). Accordingly, we will not reverse the denial of a motion for judgment as a matter of law unless "the evidence is so overwhelmingly in favor of the moving party that a reasonable jury could not arrive at a contrary verdict." Middlebrooks v. Hillcrest Foods, Inc., 256 F.3d 1241, 1246 (11th Cir. 2001).

### 1. Prior Material Breach

First, Sunbeam argues that it was entitled to judgment as a matter of law because, as a matter of law, Sunbeam could not have breached the October PSA first. Sunbeam contends that Pentalpha breached the PSA by failing to indemnify Sunbeam for its legal fees arising from the Rival and Black & Decker lawsuits and for its settlement with SEB.[5] Sunbeam contends that this breach occurred on 5 February 1998,[6] the date on which Sunbeam demanded that Pentalpha reimburse it

---

[5] Sunbeam concedes that it purchased a Schedule A bread maker from a vendor other than Pentalpha before 5 February 1998 but avers that this purchase would entitle Pentalpha to at most $13,000 in lost profit damages.

[6] Sunbeam's brief did not specify clearly a particular date on which Pentalpha breached its indemnification obligations. At oral argument, Sunbeam's counsel argued that the breach occurred on 5 February 1998 because (1) the parties stipulated that Sunbeam demanded indemnification from Sunbeam on that date; (2) the jury determined that Sunbeam was entitled to legal fees as of that date; (3) the parties do not dispute that Sunbeam was entitled to indemnification; and (4) the district court calculated prejudgment interest beginning at 5 February 1998. We do not address Sunbeam's argument. Even assuming arguendo that Pentalpha breached the PSA on 5 February 1998, Sunbeam's argument fails for the reasons

26

for its legal fees from the Rival and Black & Decker lawsuits. In response, Pentalpha argues that a reasonable jury could have concluded that Sunbeam materially breached the PSA by 28 January 1998, the beginning of the Chinese New Year holiday, by failing to transfer any tooling to Pentalpha.[7]

Florida law states that "[w]hen a contract is breached by one of the parties, the other party is released from any obligation to perform the contract." Miller v. Reinhart, 548 So.2d 1174, 1175 (Fla. Dist. Ct. App. 1989). Accordingly, if we determine that, as a matter of law, Pentalpha breached the October PSA first, we must conclude that Sunbeam was thereby released of its obligations to perform under the agreement.

After reviewing the trial record, we cannot conclude that the evidence presented "[i]s so overwhelmingly in favor of [Sunbeam] that a reasonable jury could not" have determined that Sunbeam breached the October PSA before 5 February 1998. See Middlebrooks, 256 F.3d at 1246. Paragraph 3.B of the October PSA required Sunbeam to "strive to move as much tooling as possible

explained in this section.

[7]At oral argument, Sunbeam responded that Sunbeam could not have breached the October PSA by 5 February 1998 by failing to transfer tooling to Pentalpha because (1) the PSA required Sunbeam to complete the transfer of tooling by 1 April 1998, not by the beginning of the Chinese New Year; and (2) Sunbeam continued to recognize the PSA past the beginning of the Chinese New Year. Because Sunbeam did not raise these arguments in its initial or reply briefs, we will not consider them on appeal. See Bond v. Moore, 309 F.3d 770, 774 n.5 (11th Cir. 2002).

before the Chinese New Year holiday" on 26 January 1998. R201, Exh. 112 ¶ 3.B. The PSA also explicitly provided that time was "of the essence." Id. The evidence presented at trial indicated that, despite these provisions, Sunbeam never transferred tooling for the coffee makers, garment steamers, or rotisseries to Pentalpha after Pentalpha submitted competitive bids on these products. Additionally, as of the 26 January deadline, Sunbeam had not provided samples for one product or responded to competitive bids on two others.[8] At best, the evidence presented by Sunbeam in its initial and reply briefs suggests that the jury evaluated conflicting evidence in returning a verdict in favor of Pentalpha. It does not, as is required for us to reverse the district court, compel a finding for Sunbeam. See Middlebrooks, 256 F.3d at 1246. Accordingly, we conclude that the district court did not err in denying Sunbeam's renewed motion for judgment as a matter of law.

---

[8] In its reply brief, Sunbeam points out that Sham testified that he knew, when entering the October PSA, that Sunbeam owned tooling for certain appliances, but not others; that before signing the agreement, he made no attempt to determine which tooling was available from Sunbeam "because the tooling cost is not that important . . . compared to . . . the business that we are getting;" and that he knew that Pentalpha would be required to obtain any tooling that Sunbeam did not own from other vendors or develop the tooling itself. Reply/Cross Answer Brief for Appellants Sunbeam Corporation and Sunbeam Products, Inc. at 2 (citing R9 at 121-22). Sunbeam argues that this testimony indicates that Sunbeam could not have committed a prior breach of the October PSA by failing to transfer tooling. Given the provision of the October PSA which required Sunbeam to "strive to move as much tooling as possible before the Chinese New Year holiday," R201, Exh. 112 ¶ 3.B, and Sham's testimony that he had a conversation about the ownership of the tooling after entering the October PSA, R9 at 120, 122, we do not credit the relevance of the testimony highlighted by Sunbeam.

2.    16 July 1998 Memorandum

Second, Sunbeam argues that it is entitled to a judgment as a matter of law because Pentalpha's 16 July 1998 memorandum to Sunbeam (1) breached a dependant covenant in the October PSA by reversing the one million dollar rebate, and thereby relieved Sunbeam of its contractual obligations; and (2) constituted an election of rescission by Pentalpha as the remedy for Sunbeam's breach.  In response, Pentalpha contends that (1) the jury could have reasonably found that Sunbeam committed a material breach of the October PSA by 26 January 1998, thereby freeing Pentalpha of any obligation to further perform under the October PSA; and (2) that Pentalpha did not, in the 16 July 1998 memorandum, elect to accept return of the one million dollars in full satisfaction of its claims.

a.    Breach of a Dependant Covenant

Under Florida law, "[a] breach of a [dependent] covenant amounts to a breach of the entire contract; it gives to the injured party the right to sue at law for damages . . ." or to rescind the contract in equity.  Steak House, Inc. v. Barnett, 65 So.2d 736, 738 (Fla. 1953).   In a different context, we have noted that

> '[a] covenant is dependant where it goes to the whole consideration
> of the contract; where it is such an essential part of the bargain that
> the failure of it must be considered destroying the entire contract; or
> where it is such an indispensable part of what both parties intended
> that the contract would not have been made with the covenant
> omitted. . .'

29

Hibiscus Assocs., Ltd. v. Bd. of Trustees of Policemen & Firemen Retirement Sys. of City of Detroit, 50 F.3d 908, 916 (11th Cir. 1995) (citation omitted).

In this case, regardless of whether the July 16 Memorandum and debit memo can be deemed "to go[] to the whole consideration of the contract," Hibiscus Assocs., Ltd., 50 F.3d at 916, we agree with Pentalpha that the jury could have reasonably found that Sunbeam materially breached the October PSA by 26 January 1998. See supra section II.A.1. Accordingly, Pentalpha was relieved of any remaining obligations to perform under the October PSA, see id., and Sunbeam's argument fails.

b. Election of Remedies

Florida's enactment of the Uniform Commercial Code provides that, "[u]nless the contrary intention clearly appears, expressions of 'cancellation' or 'rescission' of the contract or the like shall not be construed as a renunciation or discharge of any claim in damages for antecedent breach." F.S.A. § 672.720. The purpose of this section, according to a comment to the Code, is to "safeguard a person holding a right of action from any unintentional loss of rights by the ill-advised use of such terms as 'cancellation', 'rescission', or the like . . . ." Id., cmt. ("Purpose"). Accordingly, "unless the cancellation of a contract expressly declares that it is 'without reservation of rights', or the like, it cannot be considered to be a renunciation of this section." Id. As this Comment indicates,

30

this UCC provision abrogates any former election of remedies doctrine that would have applied under these circumstances.[9] Under F.S.A. § 672.720, an innocent party to a breached contract can both cancel the contract and, so long as he does not clearly indicate that he is waiving his right to assert breach of contract, claim damages for the breach. See F.S.A. § 672.720; see also Roth Steel Prods. v. Sharon Steel Corp., 705 F.2d 134, 151 n.36 (6th Cir. 1983) (applying UCC § 2-720 to hold that plaintiffs' cancellations did not operate as a waiver of their right to assert damages for breach); National Cash Register Co. v. Unarco Indus., Inc., 490 F.2d 285, 287 (7th Cir. 1974) (applying UCC § 2-720 and noting that "[p]laintiff is surely correct in saying that in order for the language to be found a waiver or renunciation [of any claim against defendant], such intention must clearly appear").[10]

In this case, the district court, in discussing the jury instructions with Pentalpha and Sunbeam, stated that F.S.A. § 672.720 governed Sunbeam's election of remedies claim. The district court then charged the jury that Sunbeam could establish an election of remedies defense only by demonstrating that the

_____

[9] We are mindful that F.S.A. § 2-720 does not apply to a mutual rescission by the parties to a contract. United States ex rel. Vulcan Materials v. Volpe Constr., 622 F.2d 880, 884 (5th Cir. 1980). In this case, however, Sunbeam argues that Pentalpha's alleged termination of the contract was unilateral.

[10]Although Sunbeam cites several cases which discuss the election of remedies doctrine generally, it cites no case that indicates that F.S.A. § 672.720 does not apply here.

31

memorandum and accompanying debit memo "constituted a clear expression on the part of Pentalpha that it was terminating the Supply Agreement and accepting the return of the one million dollar rebate it had previously paid to Sunbeam in full satisfaction of any claims under the Supply Agreement." R11 at 176. After deliberations, the jury found that Sunbeam did not prove that Pentalpha clearly elected the return of the one million dollars in satisfaction of its claims.

We find that the district court correctly concluded that F.S.A. § 672.720 supercedes Florida's election of remedies doctrine in this case. Moreover, there exists sufficient evidence to support the jury's verdict that the July 16 Memorandum did not constitute a clear expression that Pentalpha elected to rescind the contract and waive its rights to assert a claim for breach. The July 16 Memorandum and accompanying debit memo indicate only that Pentalpha believed that "the agreement ha[d] not been fulfilled by Sunbeam" and that it was issuing a debit note to Sunbeam for the one million dollars. R4-20, Ex. 152 at 1, 4. It does not contain language that "expressly declares that [the memorandum] is 'without reservation of rights', or the like." F.S.A. § 672.720, cmt. ("Purpose"). Accordingly, the district court did not err in denying Sunbeam's renewed motion for judgment as a matter of law.

B.     Admission of Pentalpha's Rebate Evidence

Third, Sunbeam argues that it is entitled to a new trial because the district

32

court allowed Pentalpha to introduce evidence concerning rebates Sunbeam received from other manufacturers ("the rebate evidence"), allegedly in violation of the district court's 15 December evidentiary order. According to Sunbeam, the rebate evidence could not support Pentalpha's contention that Sunbeam breached the October PSA by explicitly or implicitly promising other vendors that they could continue to manufacture Schedule A products in exchange for giving Sunbeam rebates. Sunbeam further avers that Pentalpha relied on the rebate evidence to imply unfairly that Sunbeam had an improper or unscrupulous motive in failing to perform under the October PSA. In response, Pentalpha argues that the admission of rebate evidence conformed to the district court's 15 December order and was neither irrelevant nor unfairly prejudicial.

We review a district court's evidentiary ruling for abuse of discretion. Advantage Tel. Directory Consultants, Inc. v. GTE Directories Corp., 37 F.3d 1460, 1463 (11th Cir. 1994). Abuse of discretion exists if the district court committed a clear error of judgment or applied an erroneous legal standard. Alexander v. Fulton County, Ga., 207 F.3d 1303, 1326 (11th Cir. 2000) (en banc). If we find error, we will not overturn the erroneous ruling and order a new trial unless the objecting party has demonstrated that the ruling produced a substantial prejudicial effect. Id.; Fed. R. Civ. P. 61 (erroneous evidentiary rulings should not be reversed unless refusal to do so is "inconsistent with substantial justice"). To

determine if a party's substantial rights were affected, we analyze factors including "the number of errors, the closeness of the factual disputes, the prejudicial effect of the evidence, the instructions given, and whether counsel intentionally elicited the evidence and focused on it during trial." Ad-vantage Tel. Directory Consultants, Inc., 37 F.3d at 1465 (citation omitted). In sum, we may conclude that the party's substantial rights were not affected so long as we can "'say, with fair assurance, . . . that the judgment was not substantially swayed by the error.'" Id. (citation omitted).

We conclude that the district court did not abuse its discretion in admitting the rebate evidence. A party's motive is irrelevant to a breach of contract claim under Florida law, see Southern Bell Tel. & Tel. Co. v. Hanft, 436 So.2d 40, 42 (Fla. 1983) (motive or reasons for breach are irrelevant); see also J.J. Gumberg v. Janis Servs., Inc., 847 So.2d 1048, 1049 (Fla. Dist. Ct. 2003) (per curiam) (proof of valid contract, material breach, and damages required for breach of contract in Florida), and in its 15 December order, the district court ruled that Pentalpha could not introduce rebate evidence to prove Sunbeam's motive in breaching the October PSA. Consistent with Florida law, however, the district court's order allowed Pentalpha to introduce rebate evidence tending to show that Sunbeam breached the October PSA or rebutting any evidence Sunbeam offered as to why it did not perform the October PSA.

We conclude that the district court did not abuse its discretion in admitting Wiggins's testimony. The testimony is arguably relevant[11] on either ground allowed by the district court's order and Florida law. Wiggins testified that he could not say with certainty whether there were any "wink and nod" agreements associated with the rebates from Sunbeam's existing suppliers of Schedule A products, R10 at 50-51, and that the suppliers were willing to give Sunbeam rebates because they wanted more business from Sunbeam. From this testimony, the jury could have inferred that the Sunbeam promised its suppliers that they could keep their Schedule A business if they paid a rebate.

Further, the rebate evidence tended to prove that Sunbeam failed to perform under the October PSA for reasons other than deficiencies in Pentapha's performance. During Pentalpha's reading of Nugent's deposition testimony, Sunbeam read into the record portions of Nugent's testimony in which he explained Sunbeam's failure to purchase certain Schedule A products from Pentalpha. For example, Nugent testified that Sunbeam did not purchase coffee makers or garment steamers from Pentalpha, even though Pentalpha bid successfully on those products, because Pentalpha never submitted an acceptable

---

[11] Under the Federal Rules of Evidence, "all relevant evidence is admissible." Fed. R. Evid. 402. Rule 401 defines "relevant evidence" as that which "ha[s] any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without evidence." Fed. R. Evid. 401.

project plan for a tooling transfer. Nugent also testified that Sunbeam did not purchase rotisseries before January or February of 1998 because it had current outstanding orders that needed to be filled. Under the district court's 15 December order, Pentalpha was thus then allowed to rebut the explanations offered by Sunbeam.

Even assuming the rebate evidence was irrelevant on both grounds allowed by the district court's order, Sunbeam cannot prove that it suffered a substantial prejudicial effect from the district court's ruling. First, Pentalpha offered evidence beyond Wiggins's testimony that Sunbeam materially breached the October PSA with regard to each relevant Schedule A Product. See Maiz v. Virani, 253 F.3d 641, 668 (11th Cir. 2001) (concluding that evidentiary error did not affect substantial rights in part because verdict could be supported "without considering the challenged testimony"); see also Ad-vantage Tel. Directory Consultants, Inc., 37 F.3d at 1465 (weighing "closeness of evidence" in determining effect of erroneous evidentiary ruling on party's substantial rights). For the hand mixers, supplied to Sunbeam by Tsann Kuen, Pentalpha offered evidence that Sunbeam failed to provide Pentalpha with product samples. R9 at 60. For the rotisseries, supplied to Sunbeam by Chiaphua, Pentalpha offered evidence that Sunbeam did not transfer any tooling in response to Pentalpha's

36

successful bid.  Id. at 89.  Thus, the verdict can be supported even without considering Wiggins's testimony.  See Maiz, 253 F.3d at 668.

Second, contrary to Sunbeam's argument on appeal, Pentalpha's counsel appears to have elicited the evidence for the two purposes permitted by Florida law and the district court's 15 December order.  See Ad-vantage Tel. Directory Consultants, Inc., 37 F.3d at 1465 (noting that counsel's purpose in eliciting evidence is a factor in a substantial rights evaluation).  In his closing argument, for example, Pentalpha's counsel argued that Sunbeam solicited rebates from Tsann Kuen by promising, implicitly or explicitly, that Tsann Kuen could keep its existing business of Schedule A products and that Sunbeam thereby breached the October PSA.  Sunbeam points to two specific sections in his closing argument in which, Sunbeam contends, he improperly argued that Sunbeam had an unscrupulous motive in breaching the October PSA.  First, Sunbeam points out that Pentalpha's counsel argued:

> What was really going on was that Sunbeam was discouraging Pentalpha from bidding.  If Sunbeam wanted a bid on the hand mixers it would have sent Pentalpha a sample of the hand mixers.
> I guess it was too busy soliciting its rebate from its existing supplier of hand mixers, Tsann Kuen.

Id. at 117.  Viewed in context, the first paragraph appears to have been offered to rebut Sunbeam's evidence that it breached the October PSA because of

37

deficiencies in Pentalpha's performance. The last sentence, although arguably not related to the purposes permitted by the district court's order, is not clearly related to an improper purpose either. The prejudicial nature of this remark is minimal, at most.

Second, Sunbeam cites a section of the closing in which Pentalpha's counsel stated:

> Now, the only important event that [Sunbeam's counsel] notes on his time line [of events] is the memorandum of Mr. Nugent saying, "You didn't bid on this. Where is your project plan?" Communications. That's it.
> [Sunbeam's counsel] does not attempt to demonstrate that Sunbeam did anything to perform the contract. Didn't move any tooling. Didn't try to move – didn't try to move any other tooling. But, boy, was it good at hitting up its other suppliers for rebates. What would have happened if it told its existing suppliers that they were going to have to transfer their tooling to Pentalpha? You think they would have gotten a rebate out of Tsann Kuen? Think they would have gotten a rebate out of Chiaphua?

Id. at 157-58. In these paragraphs, Pentalpha's counsel seemingly refers to the memorandum from Nugent to Pentalpha sent on 24 December 1997. Sunbeam's counsel cited this memorandum in his closing argument apparently to argue that Pentalpha had failed to submit the project plans required for Sunbeam to begin transferring tooling. R9 at 135. Thus, Pentalpha's counsel there employed the rebate evidence to rebut Sunbeam's argument that it did not purchase Schedule A products from Pentalpha because of Pentalpha's failure to fulfill its obligations.

38

This purpose is permitted by the district court's 15 December order.

Because Pentalpha offered evidence beyond Wiggins's testimony that Sunbeam materially breached the October PSA with regard to each relevant Schedule A Product, and Pentalpha's counsel apparently elicited the rebate evidence for purposes required by the district court's 15 December order, we can conclude "'with fair assurance, . . . that the judgment was not substantially swayed by [any] error'" in admitting Wiggins's testimony. Ad-vantage Tel. Directory Consultants, Inc., 37 F.3d at 1465 (citation omitted). Any error in admitting Wiggins's testimony thus did not affect Sunbeam's substantial rights. Accordingly, we decline to order a new trial because of the admission of this testimony.

C.    Pentalpha's Claim Regarding Prejudgment Interest

On cross-appeal, Pentalpha first argues that the district court erred in failing to award Pentalpha pre-verdict interest. The district court awarded interest from the date of the verdict because "an exact date [could not] be ascertained by th[e] Court as to Pentalpha's damages." R3-166 at 5. Noting that Florida courts award prejudgment interest to compensate completely the prevailing party for its loss, Pentalpha contends that the district court should have determined the date Pentalpha incurred damages based on evidence in the record and awarded pre-

verdict interest accordingly. In response, Sunbeam argues that Florida law allows pre-verdict interest only if the verdict liquidates damages as of a fixed date, which did not occur in this case.

State law determines whether a successful litigant is entitled to prejudgment interest. Venn v. St. Paul Fire & Marine Ins. Co., 99 F.3d 1058, 1066 (11th Cir. 1996). We review de novo the district court's determination of the proper legal standard under which to compute damages, and we reverse the district court's factual findings only if they are clearly erroneous. A.A. Profiles, Inc. v. City of Fort Lauderdale, 253 F.3d 576, 581 (11th Cir. 2001).

Florida's seminal case concerning prejudgment interest is Argonaut Ins. Co. v. May Plumbing Co., in which the Florida Supreme Court resolved a split in the Florida District Courts of Appeal over the circumstances under which prejudgment interest could be awarded. 474 So.2d 212 (Fla. 1985). In one line of authority, represented by Chicago Ins. Co. v. Argonaut Ins. Co., Florida appellate courts refused to award prejudgment interest in cases where, before trial, the amount of damages was disputed by the parties. 451 So.2d 876, 877 (Fla. Dist. Ct. App. 1984). Because of the dispute, the amount of damages could be determined conclusively only by a fact finder at trial. Id. at 877 (noting that claim of comparative negligence made damages uncertain before trial and that the

40

"'dispute was settled only by the jury'") (citation omitted); accord McCoy v. Rudd, 367 So.2d 1080, 1082 (Fla. Dist. Ct. App. 1979). Accordingly, the liable party had no way to determine the amount of damages he owed before trial, and he could not be found in default on a debt so as to be required to pay interest. See Tampa Elec. Co. v. Nashville Coal Co., 214 F. Supp. 647, 657 (M.D. Tenn. 1963) (applying Florida damages law). In the competing line of authority, represented by Bergen Brunswig Corp. v. State Dep't of Health and Rehabilitative Servs., Florida appellate courts awarded prejudgment interest in cases where the "verdict ha[d] the effect of fixing damages as of a prior date." 415 So.2d 765, 767 (Fla. Dist. Ct. App. 1982); accord Tech Corp. v. Permutit Co., 321 So.2d 562, 563-64 (Fla. Dist. Ct. App. 1975). Under this rule, liable parties were subject to prejudgment interest whether or not they contested the amount of damages. Bergen Brunswig Corp., 415 So.2d at 767.

The Florida Supreme Court resolved the conflict in favor of the line of authority represented by Bergen Burnswig Corp. Adopting the "loss theory" of prejudgment interest, the court concluded that prejudgment interest is "merely another element of pecuniary damages." Argonaut Ins. Co., 474 So.2d at 214-15. The certainty of the amount of damages before trial does not affect the award, and "[w]hen a verdict liquidates damages on a plaintiff's out-of-pocket, pecuniary

41

losses, [the prevailing party] is entitled, as a matter of law, to prejudgment interest at the statutory rate from the date of that loss." id. at 215.

Notably, the Florida Supreme Court did not conclude in Argonaut Ins. Corp. that every verdict liquidates a claim so as to allow an award of prejudgment interest. Instead, it concluded that a claim would be subject to prejudgment interest "when" it did so. Id. The issue we must decide here is what standard Florida law dictates we apply to determine if a verdict liquidated a claim as to a date certain.

Sunbeam argues that the Florida Supreme Court provided the standard in Argonaut Ins. Corp. when it stated:

> Once a verdict has liquidate[] the damages as of a date certain, computation of prejudgment interest is merely a mathematical computation. There is no 'finding of fact' needed. Thus, it is purely ministerial duty of the trial judge or clerk of the court to add the appropriate amount of interest to the principle amount of damages awarded in the verdict.

Id. at 215. According to Sunbeam, this language indicates that a verdict has not liquidated a claim when the record does not conclusively support any one date of loss, as choosing between the dates would constitute fact finding that goes beyond "mere[]. . . mathematical computation." Id. According to Pentalpha, our refusal to grant prejudgment interest where the preponderance of the evidence supported three alternative dates would undermine Florida's purpose to compensate fully the

42

prevailing party for its loss.[12]  Because we conclude that the dicta cited by

Sunbeam does not establish conclusively the standard to apply, we examine cases

in which the Florida District Courts of Appeal determined whether to award

damages where the jury verdict did not specify a certain date.  See Flintkote Co. v.

Dravo Corp., 678 F.2d 942, 945 (11th Cir. 1982) (noting that, absent some

"persuasive indication" that the state supreme court would decide the issue

differently, federal courts must adhere to state intermediate courts' decisions in

diversity cases if the state supreme court has not addressed an issue).

Florida District Courts of Appeal applying Argonaut have held that

prejudgment interest cannot be awarded unless there is a pecuniary loss and a date

of that loss. See Glover Distrib. Co., Inc. v. F.T.D.K., Inc., 816 So.2d 1207, 1213

(Fla. Dist. Ct. App. 2002).  "In other words, prejudgment interest attaches as an

incident of damages when it is ascertained that money ought to have been paid at a

particular time."  Florida Jurisprudence § 92 (2d ed. 2005) (citing Reilly v. Barrera,

_____

[12] Pentalpha also argues that the Florida Supreme Court expressly disavowed the standard applied by the district court.  Pentalpha notes that, in Argonaut Ins. Co., the Florida Supreme Court explicitly rejected the rule that, "'where the judgment is for damages, interest may not be added to the principal award unless there can be a conclusive determination of an exact amount due and a date from which interest can be computed.'"  474 So.2d at 214 (citation omitted).  Viewed out of context, this language seems to indicate that the Supreme Court determined that prejudgment interest can be awarded from dates prior to the verdict even if there is no "conclusive determination of an exact. . . date."  Id.  As explained above, however, the Florida Supreme Court was rejecting a rule that prejudgment interest could not be awarded where "[b]oth liability and the amount of loss were disputed at trial," which made the amount and date inconclusive.  Id.  Viewed in context, then, this language simply reiterates that rejected rule and does not indicate when a verdict liquidates damages, which is the crucial issue here.

43

620 So.2d 1116, 1118 (Fla. Dist. Ct. App. 1993) (citation omtited)).  Preverdict

interest may be awarded even if the jury did not specify a particular date of loss, so

long as a date is clear from the record.  RDR Computer Consulting Corp. v.

Eurodirect, Inc., 884 So.2d 1053, 1055 (Fla. Dist. Ct. App. 2004); but see Neva,

Inc. v. Christian Duplications Int'l, Inc., 743 F. Supp. 1533, 1543 (M.D. Fla. 1990)

(concluding that damages were unliquidated because jury verdict did not fix

damages as of a date prior to the verdict).  In breach of contract cases, Florida

courts have awarded prejudgment interest where the jury awarded damages of

precisely the amount asked for by the plaintiff through a specific date, the end of

the contract's term, see RDR Computer Consulting Corp. at 1054-55, and where

the record indicated that "the parties' contractual relationship was terminated by

formal notice prior to commencement of [litigation]," Bergen Brunswig Corp., 415

So.2d at 767.  In a tort case involving damage to a farmer's fields, a Florida court

held that the trial court erred in refusing to award prejudgment interest because the

date of loss could not be determined, where the record indicated that an accounting

report made the loss apparent to the plaintiff on a specific date.  See Charles

Buzbee & Sons, Inc. v. Falkner, 585 So.2d 1190, 1191 (Fla. Dist. Ct. App. 1991).

In a case involving theft and conversion, a Florida court held that prejudgment

interest should have been awarded from the date of the theft, even though there

was no date certain specified on the verdict form.  Vining v. Martyn, 660 So.2d 1081, 1082 (Fla. Dist. Ct. App. 1995).

In its order denying Pentalpha prejudgment interest, the district court determined that an exact date of loss was obvious from the facts of the above cases, whereas in this case, Pentalpha provided the court with a choice of dates from which to award prejudgment interest.  Citing Checkers Drive-In Rests., Inc. v. Tampa Checkmate Food Serv., 805 So.2d 941 (Fla. Dist. Ct. App. 2001), and Perdue Farms Inc. v. Hook, 777 So.2d 1047, 1055 (Fla. Dist. Ct. App. 2001), the district court then concluded that this difference prevented it from awarding pre-verdict interest.  We disagree.

First, Checkers Drive-In Rests., Inc., and Perdue Farms Inc., can be distinguished from the case here.  Checkers Drive-In Rest., Inc. involved damages based on future anticipated profits.  805 So.2d at 945.  Under Florida's loss theory of damages, the prevailing party could not be awarded prejudgment interest to compensate him for a past loss because there was no past loss.  Perdue Farms Inc., although more similar to the case before us, concerned a claim for misappropriation and involved a record from which it was "impossible to determine any date upon which [the plaintiff's] ability to market his process was lost by reason of the presence of [the defendant's allegedly copied product] in the

45

marketplace." 777 So.2d at 1055 (emphasis added).  Thus, Perdue can be distinguished because in this case, the record conclusively supports at least one date, the last day of the October PSA's term, upon which Pentalpha suffered an out-of-pocket loss.  Further, unlike in this case, the plaintiff's damage expert in Perdue Farms Inc. had failed to provide the jury with a precise value of the plaintiff's allegedly misappropriated trade secret on any particular date.  Id. at 1051. Finally, Perdue Farms Inc. involved misappropriation, a tort.  Florida courts generally do not allow prejudgment interest on tort claims because damages are often too speculative to liquidate before final judgment.  Lumbermens Mut. Cas. Co. v. Percefull, 653 So.2d 389, 390 (Fla. 1995).

Second, Florida law supports the proposition that prejudgment interest can be awarded properly from the latest possible date of loss.  See Pine Ridge at Haverhill Condo. Assoc., Inc. v. Hovnanian of Palm Beach II, Inc., 629 So.2d 151, 151 (Fla. Dist. Ct. App. 1993) (per curiam) (in a case involving construction defects to an association's condominium complex , holding that "[t]he jury finding . . . had the effect of fixing the damages at no later than the turnover date of the condominium property to the association. . . ." and awarding prejudgment interest from that date); see also Glover Distrib. Co., Inc., 816 So.2d at 1213 (affirming trial court's award of prejudgment interest because damages were liquidated "at

46

least as of" a certain date, where liable party conceded that damages could not have accrued beyond that date). The record conclusively indicates that the last date of the term of the October PSA was 30 June 2001. Accordingly, Pentalpha suffered a loss for Sunbeam's breach of contract no later than 30 June 2001.

Florida awards prejudgment interest to compensate the prevailing party for its loss. Argonaut Ins Co., 474 So.2d at 215. We conclude that the verdict liquidated Pentalpha's damages as of 30 June 2001, the last date of the October PSA's term, and prejudgment interest should be awarded from that date.

D.    Exclusion of Pentalpha's Evidence that Sunbeam Purchased More Schedule A Products than it Admitted

Pentalpha next contends that the district court erred in excluding certain evidence offered to prove the alleged incompleteness of the computer printouts provided by Sunbeam which purportedly disclosed all of Sunbeam's purchases of Schedule A products from other vendors during the October PSA's term. Pentalpha argues that Sunbeam changed its computer system on 9 May 1999 and that a programming error prevented Sunbeam from retrieving complete data before that date. This exclusion is significant to Pentalpha because Pentalpha calculated its damages by multiplying its lost profit per product by the number of units of Schedule A products that Sunbeam purchased in breach of the PSA. If Pentalpha could have introduced evidence indicating Sunbeam's alleged mistake, says

47

Pentalpha, it could have argued to the jury that the computer printouts reported only some of Sunbeam's purchases in breach of the PSA, and the jury could have awarded Pentalpha more damages.

To remedy the district court's alleged error in excluding the evidence concerning the inaccuracies in the computer printouts, Pentalpha requests in supplemental briefing that we remand its breach of contract claim for a limited new trial. In the limited new trial that Pentalpha proposes, Pentalpha would be allowed to keep its contract damages award of $6.6 million, and the jury would determine only the amount of additional damages, if any, Pentalpha deserves based on its consideration of the excluded evidence. If we decline to grant this limited new trial, however, Pentalpha wishes to withdraw its challenge entirely. In response, Sunbeam contends that Pentalpha failed to preserve its "limited trial" argument,[13]

---

[13] Sunbeam avers that Pentalpha failed to preserve its request for a new trial on account of the alleged evidentiary error because it did not seek post-trial relief or ask the district court to grant a limited new trial on this ground. In federal court, however, "'the settled rule . . . is that a party may assert on appeal any question that has been properly raised in the trial court. Parties are not required to make a motion for a new trial challenging the supposed errors as a prerequisite to appeal.'" Rand v. Nat'l Fin. Ins. Co., 304 F.3d 1049, 1052 (11th Cir. 2002) (per curiam) (citation omitted). To preserve a challenge to an evidentiary ruling, a party need only timely object to the alleged error and "state 'the specific ground of objection, if the specific ground was not apparent from the context.'" Wilson v. Attaway, 757 F.2d 1227, 1242 (11th Cir. 1985). Pentalpha has met that requirement here.

Additionally, Sunbeam contends that Pentalpha's argument in supplemental briefing is improper because Pentalpha did not request the remedy of a limited new trial in its initial brief. However, on 28 March 2005, we granted Pentalpha's motion to file supplemental briefing to address this issue. Sunbeam did not respond to Pentalpha's motion to supplement and thus cannot attempt to revisit the propriety of supplemental briefing now.

or, alternatively, that Pentalpha should be permitted to withdraw its argument because it is not entitled to a limited new trial.

Under Federal Rule of Civil Procedure 59(a), a court may grant a new trial "on all or part of the issues" so long as "it clearly appears that the issue to be retried is so distinct and separable from the others that a trial of it alone may be had without injustice." Federal Rule of Civil Procedure 59(a); Gasoline Prods. Co. v. Champlin Refining Co., 283 U.S. 494, 500, 51 S. Ct. 513, 515 (1931).[14]

Applying this standard, we conclude that Pentalpha has not established that we may properly grant a new trial limited to additional damages here. Although any additional award would be based on the same, underlying conduct as the existing award of $6.6 million, we have no way of knowing from the jury's verdict how and in what ways the jury found Sunbeam liable. We can speculate as to the

---

[14] We note that in all of the cases Pentalpha cites in support of its argument that we grant a limited new trial for additional damages while preserving its original $6.6 million breach of contract award, the issue in question was separate and distinct from the other issues in the case. See Atkinson v. Dixie Greyhound Lines, 143 F.2d 477, 479-80 (5th Cir. 1944) (preserving actual damages but granting limited new trial to determine punitive damages ); Rice v. Community Health Ass'n, 203 F.3d 283, 290 (4th Cir. 2000) (preserving award for breach of contract damages but ordering limited new trial to determine consequential damages "for loss of identifiable professional opportunities" after concluding that questions were "distinct and separable" because they involved different time frames and had distinct elements of proof) (internal quotations omitted); Boucher v. U.S. Suzuki Motor Corp., 73 F.3d 18, 21 n.3, 23 (2d Cir. 1996) (per curiam) (preserving awards for medical expenses and pain and suffering but granting new trial to determine award for lost past and future earnings where jury had "answered special interrogatories directed precisely to the issue in question").

jury's conclusions based on the damages evidence presented by Pentalpha,[15] but we cannot know for sure. At trial, the jury grappled with a complicated set of factual and legal arguments in which each party contended that the other breached the PSA at various points during the PSA's term. Pentalpha requested $14.7 million in damages on its breach of contract claim, but the jury returned a verdict for only $6.6 million. The jury gave no indication of its method of calculating damages, how its damages calculation related to Sunbeam's liability, or any specific finding as to the moment or moments in the PSA's term on which Sunbeam breached the PSA. The jury may have awarded damages for lost profits based on the entire term of the PSA, parts of the term, or on certain Schedule A products but not others. Accordingly, we cannot say with assurance that the issue of additional damages, based on the excluded evidence spanning the entire term of the October PSA, is sufficiently "distinct and separable" from the jury's calculation of $6.6 million in damages without the excluded evidence so that we may order a trial without

---

[15] At trial, Pentalpha introduced an exhibit summarizing its alleged damages. This exhibit indicates that from July 1997 to June 2001, Pentalpha suffered lost profits of $9,449,858 from Schedule A products. R4-201, Ex. 182GG. Included in this total are lost profits of $6,600,735 for four particular Schedule A Products: $553,773 for the garment steamers, $545,315 for the hand mixers, $663,904 for the rice cookers, and $4,837,743 for the ultrasonic humidifiers. Id. On appeal, Pentalpha argues that the jury awarded Pentalpha lost profits for these four products by taking Pentalpha's figures and rounding them down to the nearest thousand.

risking injustice.  See Gasoline Prods. Co., 283 U.S. at 500, 51 S. Ct. at 515.[16]  The only relief Pentalpha would be entitled–a full new trial, or at least a new trial limited to the issue of damages only–is a remedy it has specifically rejected. Accordingly, we need not address the underlying merits of Pentalpha's argument, and we decline to reverse on account of the district court's exclusion of the additional damages evidence.

E.      Pentalpha's Fraudulent Inducement Claim

We review de novo the district court's grant of summary judgment in favor of Sunbeam on Pentalpha's fraudulent inducement claim.  Velten v. Regis B. Lippert, Intercat, Inc., 985 F.2d 1515, 1519 (11th Cir. 1993).  Under Florida law, fraud in the inducement can be established if (1) there was a false statement concerning a material fact; (2) the representor knew or should have known that the representation was false; (3) the representor intended to induce another party to act in reliance on the false statement; and (4) that the party acted in reliance on the representation and was injured as a result.  See Johnson v. Davis, 480 So. 2d 625, 627 (Fla. 1985).  Additionally, the party's reliance must have been justifiable. Johnson Enters. of Jacksonville, Inc., v. FPL Group, Inc., 162 F.3d 1290, 1315

---

[16] Because we conclude that the issue of additional damages cannot be separated from the jury's calculation of the $6.6 million award, we offer no view on the propriety of a "stop loss" new trial in other circumstances.

(11th Cir. 1998).

In this case, Pentalpha argues that the district court erred in (1) reasoning that because Pentalpha entered into the June PSA without relying on any alleged misrepresentations by Sunbeam, that it must also have entered into the October Supply Agreement without relying on any alledged misrepresentations;[17] and (2) concluding that Pentalpha could not have justifiably relied on misrepresentations not contained in the October PSA, where the misrepresentations were consistent with the Agreement. In response, Sunbeam contends that (1) both the June PSA and the October PSA required Pentalpha to pay Sunbeam one million dollars; and (2) Pentalpha was not justified in relying on the alleged misrepresentations because they were not contained in the subsequent written October PSA and because the October PSA was inconsistent with the alleged misrepresentations.

Florida law consistently recognizes that "a basic tenet of contract law that reliance on representations by a contracting party in a suit based on the contract is unreasonable where the representations are not contained in the subsequent written agreement between the parties." Barnes v. Burger King Corp., 932 F.Supp. 1420,

---

[17]Specifically, Pentalpha contends that the October PSA required Pentalpha to pay one million dollars to Sunbeam, whereas the June PSA did not. Pentalpha argues that the Rider to the June PSA which stated that "Pentalpha" would pay Sunbeam one million dollars bound Pentalpha U.S., not Pentalpha. In support of this argument, Pentalpha contends that the June PSA's Rider was signed only by Lior, acting as President of Pentalpha U.S., that Lior did not disclose the Rider to John Sham, and that Pentalpha voided the June PSA, with Sunbeam's consent, after learning of the Rider.

1428 (S.D. Fla. 1996); accord Johnson Enters. of Jacksonville, Inc., 162 F.3d at 1315. Applying Florida law, courts have held that parties could not rely justifiably on representations that explicitly contradicted provisions of the contract. See Barnes, 932 F.Supp. at 1428. Courts have also held that a party could not rely justifiably on representations not contained in the contract where the party helped draft the agreement and relinquished opportunities to reduce the representations to writing. See Johnson Enters. of Jacksonville, 162 F.3d at 1315.[18]

Even assuming arguendo that Pentalpha correctly argues that the October PSA imposed significant financial obligations on Pentalpha, whereas the June PSA did not, we conclude that, under Florida law, Pentalpha could not have relied justifiably on Sunbeam's misrepresentations regarding its financial condition. Pentalpha's CEO, John Sham, participated in the negotiation of the October PSA. There is no evidence that suggests he attempted to include a provision about

---

[18] Pentalpha argues that Golden v. Mobil Oil Corp., 882 F.2d 490, 495 (11th Cir. 1989), and Gilchrist Timber Co. v. ITT Rayonier, Inc., 127 F.3d 1390, 1395 (11th Cir. 1997), establish that in Florida, a party can justifiably rely on fraudulent misrepresentations that are not contained in the written agreement. Neither case is dispositive here. In Golden, we held that a district court erred in granting a directed verdict for defendant on plaintiff's fraud claim, where defendant's "offer of a three year lease instead of a trial franchise, . . . promise that [the plaintiff] would have a 'tremendous future' with the company, and . . . referral to the proposed relationship as a 'marriage'" satisfied the first three prongs of the test for fraud. 882 F.2d at 495. However, we did not address whether the plaintiff justifiably relied on the defendant's representations. Id. at 494 (omitting justifiable reliance in elements of fraud). In Gilchrist, we concluded that a fact not included in the contract could be material for purposes of a fraudulent inducement claim. 127 F.3d at 1395. We did not explicitly address justifiable reliance.

Sunbeam's financial condition. In light of these facts, we conclude that the district court did not err in concluding that, as a matter of law, Pentalpha could not have relied justifiably on Sunbeam's alleged misrepresentations. See Johnson Enters. of Jacksonville, 162 F.3d at 1315.

F.     Denial of Judgment as a Matter of Law for Global-Tech

Finally, Global-Tech contends that the district court erred in denying Global-Tech's motion for judgment as a matter of law at the close of Sunbeam's case-in-chief. Citing Johnson Enters. of Jacksonville, Inc., Global-Tech argues that Sunbeam offered no evidence to support a finding that Global-Tech used Pentalpha to engage in improper conduct. In response, Sunbeam asserts that Global-Tech waived its argument by failing to renew its motion for a directed verdict at the close of all of the evidence. Alternatively, Sunbeam contends that it made a prima facie case of Global-Tech's liability sufficient to submit the question to the jury.

Under Federal Rule of Civil Procedure 50(b), a movant must file a directed verdict motion at the close of all of the evidence in order to challenge the sufficiency of the evidence on appeal. Fed. R. Civ. Pr. 50(b); Rand, 304 F.3d at 1051. We have declined to examine the sufficiency of the evidence supporting a jury's verdict where a defendant moved for a directed verdict at the close of the plaintiff's case but failed to renew the motion at the conclusion of all of the

54

evidence.  Coker v. Amoco Oil Co., 709 F.2d 1433, 1437 (11th Cir. 1983),

superceded by statute on other grounds; Special Promotions, Inc. v. Southwest

Photos, Ltd., 559 F.2d 430, 432 (5th Cir. 1977).[19]  In such cases, "our inquiry is

limited to whether there was any evidence to support the jury's verdict, irrespective

of its sufficiency, or whether plain error was noted which, if not noticed, would

---

[19] Citing Perceptron, Inc. v. Sensor Adaptive Machs., Inc., 221 F.3d 913, 918 n.3 (6th Cir. 2000), Global-Tech argues that it did not need to renew its motion at the close of all of the evidence because testimony introduced after the motion related only to Pentalpha's counterclaim against Sunbeam and not to Pentalpha or Global-Tech's defense of Sunbeam's indemnification claim.

In related contexts, we have overlooked technical deviations from Rule 50(b)'s requirements so long as the parties' actions satisfied the purpose of the Rule, i.e., alerting the court and opposing counsel of any insufficiencies before submitting the case to the jury. See Rankin  v. Evans, 133 F.3d 1425, 1432 (11th Cir. 1998) (listing cases).  In Coker, however, we declined to excuse the defendant's failure to renew its motion at the close of all of the evidence even though it presented only one witness who testified briefly. Coker, 709 F.2d at 1437-38. Noting that "[Rule] 50(b) clearly requires a movant to file a directed verdict motion at the end of all of the evidence in order to challenge the sufficiency of the evidence on appeal" we concluded "[t]he length of a movant's evidentiary presentation or demonstration, after the fact, that compliance probably would have been futile does not satisfy the rule's requirement." Id. at 1437-38.

In this case, our review of the record indicates that the defendants did offer evidence relating to Global-Tech's relationship with Pentalpha after Global-Tech's motion for a directed verdict.  In a portion of Nugent's deposition testimony read to the jury by Global-Tech's counsel, Nugent described his understanding of the relationship between Pentalpha, Wing Shing, and Global-Tech.  Nugent testified:

> My understanding is Pentalpha and Wing Shing are practically synonymous, same corporation.  And Global-Tech is a – I'm not sure where they're registered, but a listed company on the New York Stock Exchange as a parent company of Pentalpha Wing Shing.  In Hong Kong, Wing Shing and Pentalpha, the names are used interchangeably.

R9 at 167.  Although this testimony has little probative value, it arguably constitutes evidence in defense of Sunbeam's alter ego claim.  It tends to show that a representative of Sunbeam understood that Global-Tech and Pentalpha were separate entities.  Applying Coker, we thus conclude that Global-Tech failed to satisfy Rule 50(b), and Pentalpha's argument is without merit.  See Coker, 709 F.2d at 1437-38.

result in a 'manifest miscarriage of justice.'" Wilson, 757 F.2d at 1237.

As we have recognized, Florida law allows a party to pierce the corporate veil and hold a parent corporation liable for its subsidiary's actions if it can demonstrate first, "that the subsidiary was a 'mere instrumentality' of the parent," and second, "that the parent engaged in 'improper conduct' through its organization or use of the subsidiary." Johnson Enters. of Jacksonville, Inc., 162 F.3d at 1320 (citing Dania Jai-Alai Palace, Inc. v. Sykes, 450 So.2d 1114, 1117-21 (Fla. 1984)). A parent has engaged in the requisite "'improper conduct'" only where "'the corporation was a mere device or sham to accomplish some ulterior purpose . . . or where the purpose is to evade some statute or to accomplish fraud or illegal purpose.'" Id. (citation omitted). Applying this standard, a Florida District Court of Appeal indicated that improper conduct exists where a subsidiary corporation was utilized to shield its parent from liability for a transaction that was, in actuality, between the parent and an uninformed third party. USP Real Estate Inv. Trust v. Disc. Auto Parts, Inc., 570 So.2d 386, 392-93 (Fla. Dist. Ct. App. 1990); cf. Riley v. Fatt, 47 So.2d 769, 773 (Fla. 1950) (refusing to pierce corporate veil where plaintiff had not alleged or submitted proof that a corporation's "members fraudulently used the corporation as a means of evading liability with respect to a transaction that was, in truth, personal and not corporate").

In this case, Global-Tech does not dispute that Pentalpha was a "mere instrumentality" of Global-Tech, and we must determine only whether there was any evidence introduced to support a finding that Global-Tech engaged in improper conduct through its organization or use of Pentalpha. See Wilson, 757 F.2d at 1237. We find that there was such evidence. Sunbeam argues that Global-Tech's corporate veil should be pierced because, after representing in public filings that Global-Tech–not its subsidiary Pentalpha–had a long term supply agreement with Sunbeam, and that Global-Tech–not its subsidiary Pentalpha–engaged in the business of designing and manufacturing home appliances for Sunbeam, Global-Tech asserted its separate corporate status in this action to avoid liability. To support this argument, Sunbeam cites testimony of John Sham concerning statements in Global-Tech's Annual Reports. Sham's testimony constitutes some evidence of improper conduct by Global-Tech through its organizational structure, which is all that is required under this standard of review. We thus conclude that the district court did not commit plain error in failing to grant judgment as a matter of law in favor of Global-Tech.

## IV. CONCLUSION

On appeal, Sunbeam argues that the district court erred in refusing to grant it judgment as a matter of law on Pentalpha's breach of contract claims or order a

new trial because of allegedly improperly admitted rebate evidence. On cross-appeal, Pentalpha contends that the district court erred in denying Pentalpha pre-verdict interest on its breach of contract award, in excluding certain evidence which could have resulted in increased damages for Pentalpha, and in denying a directed verdict for Global-Tech, its parent company. We conclude that the district court did not commit error in denying Sunbeam's motions for judgment as a matter of law on Pentalpha's breach of contract claim and for a new trial based on improperly admitted rebate evidence. Additionally, we determine that the district court committed error in denying Pentalpha pre-verdict interest on its breach of contract claim and conclude that interest should have been awarded from 30 June 2001, the last date of the October PSA's term. We also conclude that the district court did not err in excluding Pentalpha's evidence that Sunbeam's damages computer printouts were incomplete or in denying a directed verdict for Global-Tech. Accordingly, we **AFFIRM** in part, **REVERSE** in part, and **REMAND** for proceedings consistent with this opinion.