[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 13-15258
_____

D.C. Docket No. 3:09-cv-13723-MMH-JBT

CHERYL SEARCY,

Plaintiff-Appellee,

versus

R.J. REYNOLDS TOBACCO COMPANY, et al.,

Defendants-Appellants.

_____

Appeal from the United States District Court
for the Middle District of Florida
_____

(September 5, 2018)

Before MARTIN, ANDERSON, and JULIE CARNES, Circuit Judges.

JULIE CARNES, Circuit Judge:

Cheryl Searcy ("Plaintiff") sued the defendants, R.J. Reynolds Tobacco Company and Philip Morris Inc. (together, "Defendants") for unintentional and intentional torts arising from the death of her mother, Carol Lasard, alleging that Lasard's illnesses were caused by her addiction to cigarettes manufactured by Defendants.  The jury found for Plaintiff on both the unintentional and intentional tort claims and awarded substantial damages.  Defendants assert on appeal that the district court violated their due process and Seventh Amendment rights when it directed the jury that it should deem Defendants' alleged tortious conduct in the present case to have been proven based on the findings of another jury in a prior proceeding.  Defendants also contend that the district court should have applied Florida's comparative fault statute to reduce the jury's damages award based on the fault the jury attributed to Lasard.  After careful review, we affirm the district court.

## I.    PROCEDURAL AND FACTUAL BACKGROUND

### A.    The *Engle* Litigation

This is an "*Engle* progeny" case—so named because it stems from the *Engle* class action initiated in 1994 in Florida state court against the major tobacco companies alleging negligence, strict liability, fraudulent concealment, and conspiracy to conceal (among other claims), arising from these companies'

2

manufacture and sale of cigarettes.  Although much ink could be (and has been) spilled describing the history of *Engle* litigation over the past two and a half decades, we cover only the most pertinent facts here.[1]

Suffice it to say, the initial *Engle* class action culminated in jury findings establishing certain elements of Defendants' conduct (the "*Engle* jury findings") that the Florida Supreme Court determined would be given res judicata effect in subsequent lawsuits brought by members of the *Engle* class.  *See Engle v. Liggett Grp., Inc.*, 945 So. 2d 1246, 1276–77 (Fla. 2006).  According to that court, the *Engle* jury did not decide the defendants' liability, but instead "decided issues related to [the defendants'] conduct."  *Id.* at 1263.  As a result, the Florida Supreme Court held that *Engle* "progeny" plaintiffs may use the *Engle* jury findings to establish the conduct elements for the "strict liability, negligence, breach of express and implied warranty, fraudulent concealment, and conspiracy to fraudulently conceal claims alleged by the *Engle* class."  *Philip Morris USA, Inc. v. Douglas*, 110 So. 3d 419, 436 (Fla. 2013).

Specifically, the *Engle* jury findings establish:  (1) "that smoking cigarettes causes" various diseases, including "lung cancer"; (2) "that nicotine in cigarettes is addictive"; (3) "that the defendants placed cigarettes on the market that were

---

[1]  For a more complete history, *see Graham v. R.J. Reynolds Tobacco Co.*, 857 F.3d 1169, 1174–81 (11th Cir. 2017) (en banc); *see also id.* at 1196–1212, 1221–1285 (Tjoflat, J., dissenting).

3

defective and unreasonably dangerous"; (4) "that the defendants concealed or omitted material information not otherwise known or available knowing that the material was false or misleading or failed to disclose a material fact concerning the health effects or addictive nature of smoking cigarettes or both"; (5) "that the defendants agreed to conceal or omit information regarding the health effects of cigarettes or their addictive nature with the intention that smokers and the public would rely on this information to their detriment"; (6) "that all of the defendants sold or supplied cigarettes that were defective"; (7) "that all of the defendants sold or supplied cigarettes that, at the time of sale or supply, did not conform to representations of fact made by said defendants"; and (8) "that all of the defendants were negligent." *Engle*, 945 So. 2d at 1276–77.

Thereafter, in the progeny phase of *Engle* litigation, "individual plaintiffs must establish (i) membership in the *Engle* class; (ii) individual causation, i.e., that addiction to smoking the *Engle* defendants' cigarettes containing nicotine was a legal cause of the injuries alleged; and (iii) damages." *Douglas*, 110 So. 3d at 430.

## B.    This Case

Plaintiff's mother, Carol Lasard, died of lung cancer and chronic obstructive pulmonary disease, having been addicted to cigarettes since she was fifteen years old. Proceeding as an *Engle* class member, Plaintiff sued both R.J. Reynolds and

4

Phillip Morris—the companies that manufactured the cigarettes Plaintiff claims caused her mother's death.  She asserted both non-intentional tort claims (negligence and strict liability) and intentional tort claims (concealment and conspiracy to conceal).  At issue for purposes of Defendants' present due process challenge are the intentional tort claims, hereinafter referred to as the "concealment claims."  As to the concealment claims before it, the *Engle* jury had found that the defendant tobacco companies had "<u>concealed</u> or omitted <u>material information</u> not otherwise known or available knowing <u>that</u> the material <u>was false or misleading or failed to disclose a material fact</u> concerning <u>the health effects or addictive nature</u> of smoking cigarettes or both" and further that these defendants had agreed to conceal "information regarding the health effects of cigarettes or their addictive nature with the intention that smokers and the public would rely on this information to their detriment."  *See Engle*, 945 So. 2d at 1277 (emphasis added).  Yet, to prevail on an intentional tort claim, a plaintiff who is a member of the *Engle* class cannot rest solely on the above *Engle* findings but must prove that the defendant's tortious act caused her injury:  that is, for a concealment claim, the plaintiff must show that in deciding or continuing to smoke, she relied on the particular misleading information disseminated by the particular defendant and that such reliance caused harm.  *See Philip Morris USA, Inc. v. Russo*, 175 So. 3d 681, 686 (Fla. 2015)

5

("*Engle*-progeny plaintiffs must certainly prove detrimental reliance in order to prevail on their fraudulent concealment claims."); *Hess v. Philip Morris USA, Inc.*, 175 So. 3d 687, 698 (Fla. 2015) (same).

Plaintiff indicates that there were two types of concealed information on which her mother, Lasard, relied. First, Lasard began smoking as a young girl, before cigarette warnings were required, and the concealment at issue for that time period was the *Engle* defendants' general failure to warn the public that smoking could be addictive and dangerous to one's health, as well as their marketing of filtered cigarettes as being healthier. The evidence of this concealment "was based on the general conduct findings in *Engle* . . ." But, at trial, Plaintiff also focused on a type of concealment specific to Lasard that Defendants note was not common to the entire *Engle* class nor necessarily decided by the *Engle* jury as an act on which it based its class-wide concealment findings: the misleading marketing of low-tar/low-nicotine cigarettes as being safer than other types of cigarettes on the market.

The trial court instructed the jury that it should rely on the *Engle* findings as if the jury had found those facts itself. The court did not instruct the jury that to the extent it based its verdict on the alleged concealment related to the low-tar/low-

6

nicotine cigarettes, Plaintiff would bear the burden of proving that particular act of concealment.

At trial, the jury found that Defendants were liable on both the unintentional tort claims of negligence and strict liability, as well as on the intentional tort claims of fraudulent concealment and conspiracy to fraudulently conceal. The jury awarded Plaintiff $6,000,000 in compensatory damages and $20,000,000 in total punitive damages.

In response to a question on the special verdict form asking whether Plaintiff shared any fault for her injury, the jury allocated 40% of the fault to Lasard and 30% to each Defendant. In thereafter preparing the judgment, the district court acknowledged that Plaintiff's negligence claim was subject to apportionment based on her degree of fault, but nevertheless it did not reduce her damages to reflect that finding. The court explained that Defendants had also been found liable on intentional tort claims (the fraudulent concealment and conspiracy to fraudulently conceal), which unlike a negligence claim are not subject to apportionment under Florida's comparative fault statute, Florida Statute § 768.81. Because the jury had returned a single damages award that was not divided between the two types of claims—one of which was subject to apportionment based on a plaintiff's fault and

7

one of which was non-apportionable—the court concluded that it could not properly reduce the award based on Lasard's degree of fault.

Although the district court did not adjust the damages award based on Lasard's comparative fault, it did conclude that both the compensatory and punitive award were excessive. The court therefore remitted the award to $1,000,000 in compensatory damages, owed jointly and severally by Defendants, and $1,670,000 in punitive damages, owed independently by each.

## C.    Defendants' Enumeration of Errors

On appeal, Defendants allege three errors. The first two involve alleged constitutional violations arising from the district court's use of the *Engle* findings. First, Defendants contend that the district court erroneously permitted Plaintiff to rely on the *Engle* findings to establish the conduct elements of her intentional tort claims for concealment and conspiracy to conceal. Defendants argue that, by allowing the jury to rely on these findings, the district court violated Defendants' federal due process rights. Second, Defendants argue that to determine whether punitive damages were warranted, the district court required the jury to speculate as to the basis for the *Engle* findings. Defendants say this exercise violated the Seventh Amendment's Reexamination Clause. Finally, Defendants contend that the district court erred by refusing to apply Florida's comparative fault statute to

8

reduce Plaintiff's damages commensurate with her own fault, as determined by the jury.  Alternatively, Defendants argue that Plaintiff waived her right to contest a reduction.

## II.    DUE PROCESS CHALLENGE

### A.    The Trial Proceedings

Addressing Defendants' due process argument, we review questions of constitutional law *de novo*.  *Nichols v. Hopper*, 173 F.3d 820, 822 (11th Cir. 1999). The district court here instructed the jury that, before it could apply the *Engle* jury findings, it must first determine whether Plaintiff was a member of the *Engle* class. To be a member of that class, the court explained, Plaintiff had to prove that her mother was addicted to cigarettes containing nicotine and that this addiction was a legal cause of her death.  The court further directed that, if the jury found that Plaintiff had proved membership in the *Engle* class, it must then apply the pertinent findings made in *Engle*, just as if the jury had determined those facts themselves.  Once again, those findings were that:  (1) nicotine is addictive and smoking cigarettes causes lung cancer; (2) the *Engle* defendants (including Defendants) were negligent; (3) the *Engle* defendants placed cigarettes on the market that were defective and unreasonably dangerous; (4) the *Engle* defendants concealed material information that was not otherwise known, knowing that the

9

material was false or misleading, or they failed to disclose a material fact concerning the health effects or addictive nature of smoking cigarettes, or both; and (5) the *Engle* defendants agreed to conceal the health effects of cigarettes or their addictive nature, with the intention that smokers would rely on this information to their detriment.

In other words, all that was left for the jury to decide was whether Defendants' conduct was a legal cause of Lasard's injuries for the negligence, strict liability, and concealment claims—if so, the *Engle* jury findings took care of the rest and established that Defendants had acted tortiously. And to repeat, the question of whether Defendants had concealed material information concerning the health effects or addictive nature of smoking cigarettes was not to be reconsidered by the jury, as that determination had already been made in the earlier *Engle* proceeding. Instead, as instructed by the court, the only question before the jury on the concealment claims was whether Plaintiff's mother had relied to her detriment on information that the jury was directed to find was both material and had been concealed by Defendants, concerning the health effects or addictive nature of smoking cigarettes. Finally, if the jury found this reliance, it must lastly decide whether this reliance was a legal cause of Lasard's lung cancer and death. The jury found that Lasard had so relied and, given that answer, it found Defendants

10

liable on the concealment claims, as well as the negligence and strict liability claims.

### B.    Defendants' Due Process Challenge to the Preclusive Effect of *Engle* on Plaintiff's Concealment Claims

#### 1.    Defendants' Arguments

Defendants contend that their due process rights were violated by giving preclusive effect to the *Engle* jury findings relating to Plaintiff's negligence, strict liability, and concealment claims. Defendants acknowledge, however, that our precedent forecloses a due process challenge to the application of the *Engle* jury findings on negligence and strict liability claims. Specifically, in *Graham v. R.J. Reynolds Tobacco Company*, 857 F.3d 1169, 1183–86 (11th Cir. 2017) (en banc), our Court held that treating the *Engle* jury findings on negligence and strict liability as res judicata did not violate due process, affirming our earlier decision in *Walker v. R.J. Reynolds Tobacco Company*, 734 F.3d 1278, 12877–90 (11th Cir. 2013). Accordingly, based on this precedent, we likewise hold that the district court's instruction that the jury must apply the *Engle* findings in deciding Plaintiff's negligence and strict liability claims did not violate Defendants' due process rights.

Yet, neither *Walker* nor *Graham* faced the question whether the *Engle* jury findings on intentional concealment claims would survive a due process challenge,

11

and, until recently, that has remained an open issue.[2]  In both its pre-*Graham* and

post-*Graham* briefing, Defendants have argued that an intentional concealment

claim—depending as it must on a specific statement or omission by a specific

defendant—presents due process issues that did not necessarily arise with a class-

wide negligence or strict liability claim.  Relying largely on the Supreme Court's

opinion in *Fayerweather v. Ritch*, 195 U.S. 276 (1904), Defendants have

consistently argued that, to satisfy due process, a court may only give issue-

preclusive effect to an earlier jury's findings if that jury "actually decided" the

matter that is at issue in the second proceeding.  Indeed, in *Graham,* we assumed

without deciding that Defendants are right; that is, that due process requires that

the factual matter was actually decided by the jury on whose finding preclusion is

sought.  *See Graham*, 857 F.3d at 1181 ("We will assume, without deciding, that

the 'actually decided' requirement is a fundamental requirement of due process

under *Fayerweather . . .*").  Acting on that assumption, we ourselves reviewed the

*Engle* proceedings and announced that we were "satisfied that the *Engle* jury

actually decided common elements of the negligence and strict liability of [the

*Graham* defendants]."  *Id.*

---

[2]  Concealment claims were likewise not before the Florida Supreme Court in the seminal
Florida case that accorded preclusive effect to the *Engle* findings:  *Philip Morris USA,
Inc. v. Douglas*, 110 So. 3d 419 (Fla. 2013).

Relying on *Graham,* Defendants argue in their first supplemental brief that we should likewise review the *Engle* record to determine whether the concealment found by the *Engle* jury to have occurred class-wide among all the defendants was necessarily the same concealment or misrepresentation on which Lasard relied in deciding to continue to smoke. Defendants insist that having undertaken this review, we will find it impossible to conclude, based on the unspecified concealment found class-wide by the *Engle* jury, that the latter necessarily decided that the particular concealment asserted here by Plaintiff occurred.

Specifically, Defendants say, the *Engle* jury rendered what Plaintiffs have called "the general conduct findings," which stated, in pertinent part, that the *Engle* defendants had "failed to disclose a material fact concerning the health effects or addictive nature of smoking cigarettes, or both." *Engle*, 945 So. 2d at 1277 (emphasis added). In short, these finding indicate the *Engle* jury's conclusion that the tobacco companies had either not told the public that smoking would damage a person's health or had not made public their awareness that cigarette-smoking is an addictive activity, or maybe both. Yet, given the numerous theories of concealment advanced at the *Engle* trial, Defendants argue that it is impossible to figure out on which act or acts of concealment the *Engle* jury was focusing when it made the above findings. And given the fact that our holding in *Graham* was

13

conditioned on our conclusion that the Florida Supreme Court in *Engle* and *Douglas* had determined that the *Engle* jury had actually decided <u>only</u> those issues that were common to the class as a whole, *Graham*, 857 F.3d at 1183 ("The only way to make sense of these [*Engle*] proceedings is that the Florida courts determined that the *Engle* jury actually decided issues common to the class . . ."), Defendants argue that to be able to apply the *Engle* general concealment finding to a particular concealment theory presented in a progeny case, one has to be able to identify the <u>common</u> act(s) of concealment that the *Engle* jury had in mind in reaching its finding.

That is simply not doable, Defendants argue, given the multiplicity of concealment allegations and the inability to figure out which theories the *Engle* jury might have discarded versus which theories they found to have been proved by the *Engle* plaintiffs by a preponderance of the evidence.  Finally, with regard to the "general conduct finding," Defendants complain that because it is framed in the disjunctive, the *Engle* jury findings do not establish whether the *Engle* jury actually decided that Defendants concealed material information about the health effects of cigarettes or whether instead the jury decided that it was the concealment of the addictive nature of cigarettes that the jury found tortious.

14

Defendants note that all of the above problems are magnified in this case because, in attempting to prove her own concealment claim, Plaintiff focused greatly on a very specific theory of concealment:  that Defendants had, through misleading advertisements, misled the public into believing that low-tar or low-nicotine cigarettes were healthier than normal cigarettes, when in fact those "low" cigarettes were just as bad for the smoker as were standard cigarettes.

According to Defendants, the problem with Plaintiff's particular concealment theory is there is no way to determine whether the *Engle* jury actually bought that argument because its findings give no clue as to what acts of concealment it had actually found.  Defendants emphasize that the *Engle* jury was presented with thousands of different alleged misstatements as to the effects of cigarettes that the jury could have used as the basis for its general finding that something had been concealed.  So, ultimately, Defendants say, it is anyone's guess as to what information the *Engle* jury actually decided had been concealed by Defendants.  Taken altogether, Defendants argue that it simply cannot be determined whether the *Engle* jury actually decided that Defendants fraudulently concealed material information about low-tar cigarettes which is the concealment on which Lasard specifically relied.

15

And to underscore the unlikelihood that the *Engle* jury found that Defendants concealed information about low-tar/low-nicotine cigarettes in particular, Defendants point out that the Florida Supreme Court had premised its decision to give preclusive effect to the *Engle* findings on the court's conclusion that the jury had decided only those issues that were "common to the entire class." *Douglas*, 110 So. 3d at 422. Because not all of the members of the *Engle* class smoked low-tar/nicotine cigarettes, Defendants argue that it is impossible to conclude that the *Engle* jury necessarily based a <u>class-wide</u> finding of concealment on a theory applicable to only some plaintiffs. And, according to Defendants, that is a fairly significant problem for a plaintiff like Searcy, who based a large part of her case on the concealment claims on Defendant's alleged deceptive marketing of low-tar/nicotine cigarettes.

### 2. Supplemental Briefing

After we reiterated in *Graham* that giving preclusive effect to the *Engle* jury findings on negligence and strict liability did not violate due process, the parties simultaneously filed supplemental briefs to address *Graham*'s impact on the preclusive effect of the *Engle* jury's concealment findings. Plaintiff maintained that *Graham* reaffirmed our holding in *Walker* that we need not look through the *Engle* record to determine what the *Engle* jury actually decided, 857 F.3d at 1174,

16

while Defendants argued that *Graham* stood for precisely the opposite proposition because we expressly noted in *Graham* that we had reviewed the *Engle* trial record ourselves, which permitted us to conclude "that the *Engle* jury actually decided common elements of the negligence and strict liability," *id.* at 1181. As set out above, Defendants insisted that, unlike the *Engle* jury findings on negligence and strict liability, there was no theory of common liability regarding the concealment claims—which they say could have been based on potentially thousands of different individual statements by the *Engle* defendants or one of many different facets of cigarette advertising.

Because Plaintiff and Defendants had filed their supplemental briefing on *Graham* simultaneously, Plaintiff's brief had not addressed Defendants' argument that it was impossible to figure out which specific act or acts of concealment the *Engle* jury had actually decided was common to all defendants. Nor did Plaintiff address Defendants' observation that *Graham* "assume[d], without deciding, that the 'actually decided' requirement is a fundamental requirement of due process" and, acting on that assumption, conducted an independent review of the *Engle* proceedings to determine that "the *Engle* jury actually decided common elements of the negligence and strict liability" claims as to all defendants. *Id.*

17

Given the review of the *Engle* trial record undertaken in *Graham*, we directed the parties to provide additional briefing that would help us undertake a similar review to determine whether the *Engle* jury had actually decided that the *Engle* defendants had deceptively marketed low-tar cigarettes, which appears to be the concealment theory on which Plaintiff largely relied.  Accordingly, we directed Plaintiff and Defendants to file further briefing to answer a set of questions issued by the Court about what the *Engle* jury actually decided as that would relate to the theory of concealment that Plaintiff pursued in the present case.[3]

Notwithstanding that directive, Plaintiff, in her second supplemental brief, was unable to provide any support for an argument that the *Engle* jury's finding of liability against the Defendants on the concealment claims was based on concealment related to the deceptive marketing of low-tar cigarettes, as opposed to

---

[3]  In her concurring opinion, Judge Martin indicates her disagreement with our decision to ask for supplemental briefing on the above question, indicating that this briefing was unnecessary because *Graham*'s holding "rest[ed] on giving full faith and credit to the judgment of the Florida Supreme Court."  Concurring Op. at 1, 3.  But that mischaracterizes *Graham* and misses the point.  First, if *Graham* was merely following *Engle* and *Douglas*, then there was no reason for the Court to review the *Engle* trial record.  Second, as *Graham* correctly observed, a state proceeding is only entitled to full faith and credit <u>if it complies with due process</u>.  857 F.3d at 1185 ("'[S]tate proceedings need do no more than satisfy the minimum procedural requirements' of due process to receive full faith and credit.  The record in this appeal establishes that R.J. Reynolds and Philip Morris were afforded the protections mandated by the Due Process Clause." (alteration in original) (citation omitted) (quoting *Kremer v. Chemical Constr. Corp.*, 456 U.S. 461, 481 (1982))); *see also Kremer*, 456 U.S. at 482 ("The State must, however, satisfy the applicable requirements of the Due Process Clause.  A State may not grant preclusive effect in its own courts to a constitutionally infirm judgment, and other state and federal courts are not required to accord full faith and credit to such a judgment." (emphasis added)).

18

one of the many other theories of concealment posed by the *Engle* plaintiffs.[4]

Instead, in this second supplemental brief, Plaintiff simply repeated her legal argument, which is essentially that:  even if this Court could not conclude that the *Engle* jury had actually decided a concealment theory that was common to all defendants and that could therefore be applied in all subsequent trials, such a conclusion did not matter.  According to Plaintiff, because the Florida Supreme Court had determined that the findings of the *Engle* jury concerning the concealment claims should be given preclusive effect in future trials, the Full Faith and Credit Clause precludes this Court from questioning that decision, Defendants' due process challenge notwithstanding.  In short, Plaintiff does not argue, or offer any evidence to support an argument, that the *Engle* jury necessarily based its finding of concealment against the tobacco company defendants on the defendants' conduct regarding the marketing of low-tar cigarettes.  This being Plaintiff's

---

[4]  Plaintiff's only citation or discussion of the *Engle* trial record was her single-sentence incorporation by reference of a filing made in another case.  Arguably, this is insufficient on its face.  *See Carmichael v. Kellogg, Brown & Root Servs., Inc.*, 572 F.3d 1271, 1283 (11th Cir. 2009) (holding that an issue that a party "fail[s] to develop" an argument for and does not "offer any citation to the record in support of it" is "waived"); *Four Seasons Hotels & Resorts, B.V. v. Consorcio Barr S.A.*, 377 F.3d 1164, 1167 n.4 (11th Cir. 2004) ("reject[ing] the practice of incorporating by reference" arguments made in filings outside a party's appellate briefs).  At any rate, the referenced filing cites to only four instances where the *Engle* jury—in the course of a year-long trial—was presented with evidence about the *Engle* defendants' concealment of information related to low-tar cigarettes.

19

position, we therefore have to assume that the *Engle* jury *did not* actually decide that question.

So, the threshold question before us became how we would decide that which *Graham* had only assumed:  whether due process requires that a factual issue must have been "actually decided" in an earlier proceeding for that issue to be given preclusive effect in a later proceeding.  We were saved from having to answer that question, however, because while awaiting the filing of Defendants' second supplemental brief, another panel of this Court decided the overarching question before us.  That panel held that due process is not violated by applying preclusive effect to the *Engle* jury's concealment findings in a subsequent trial. *See Burkhart v. R.J. Reynolds Tobacco Co.*, 884 F.3d 1068, 1091–93 (11th Cir. 2018).

As in this case, the defendants in *Burkhart* had argued that, while *Graham* decided the due process question as to *Engle* negligence and strict liability claims, *Graham* did not address the due process considerations applicable to concealment claims.  The *Burkhart* court agreed, acknowledging that *Graham* had not decided whether its holding would also protect against a due process challenge to the giving of preclusive effect to the *Engle* concealment findings.  In deciding that issue, *Burkhart* read *Graham* as holding that for purposes of giving res judicata

20

effect to *Engle* findings, due process is satisfied so long as the defendants had notice and an opportunity to be heard on the claims at issue. 884 F.3d at 1092. And *Graham* concluded that the tobacco defendants had been put on notice of the class's "common evidence and theories of negligence and strict liability," and "were given an opportunity to be heard on the common theories in a year-long trial . . ." *Id.* (quoting *Graham*, 857 F.3d at 1185). Ultimately, *Burkhart* concluded that the above rationale "applies equally . . . to *Engle* progeny plaintiffs' concealment and conspiracy claims." *Id.* at 1092–93. That is, the *Engle* defendants had notice and an opportunity to be heard regarding those claims as well. In short, *Burkhart* held that the "shared rationale in *Graham* and *Walker* . . . . make clear that treating as preclusive the *Engle* jury's findings as to the conduct elements of *Engle* progeny plaintiffs' fraudulent concealment and conspiracy claims does not violate due process." *Id.* at 1091.

Admittedly, *Burkhart* did not examine the question that has been before us in this case through supplemental briefing. Specifically, for purposes of granting preclusion consistent with the due process clause, is it enough that a defendant had a right to be heard on a plaintiff's claims in a first action, if ultimately one is unable to discern what the jury actually decided in making its findings on those claims? Again, as applicable to this case, the *Engle* jury rendered a very general

21

finding that the tobacco defendants had concealed material information.  Yet multiple acts of concealment had been presented to the *Engle* jury, and their general finding did not indicate which acts of concealment may have underlain their finding versus which allegations of concealment they might have rejected. Fast forward to a later progeny case relying largely on a very specific type of concealment—the concealment of the harmful effect of low-tar/low-nicotine cigarettes—and it becomes difficult to determine whether the *Engle* jury's basis for its general finding of concealment was the particular concealments regarding low-tar/low-nicotine cigarettes.  But, in this later trial, the jury is essentially told that the *Engle* jury found this act of concealment to have occurred and that the progeny jury should consider it to have been proved.  A concern that due process may require that an issue/claim/fact must have actually been decided by an original jury to be given preclusive effect was important enough to the *Graham* majority to prompt it to parse the *Engle* record to insure that the negligence/strict liability claims before it represented common claims that the jury had necessarily decided.

Even though the same argument was raised before the *Burkhart* panel, the latter did not address this intriguing question, and we conclude that the panel's rejection of a due process challenge to the application in progeny cases of the *Engle* jury findings regarding concealment claims was categorical.  Indeed,

22

although they disagree with *Burkhart*'s conclusion, Defendants now concede that this Court has conclusively resolved this issue.  Because we are bound to follow precedent, the *Burkhart* decision therefore ends any debate in this court as to whether the *Engle* jury findings related to the concealment claims are to be given preclusive effect.  The answer is:  they will.  And that being so, we are required to reject Defendants' same due process argument here.

## III.    SEVENTH AMENDMENT CHALLENGE

### A.    Reexamination Clause of the Seventh Amendment

Defendants argue that the jury's award of punitive damages must be vacated because the jury's consideration of this issue was impermissible under the Seventh Amendment of the United States Constitution.  This argument raises a constitutional question that is reviewed *de novo*.  *Nichols*, 173 F.3d at 822.  The Reexamination Clause of the Seventh Amendment states that "no fact tried by a jury, shall be otherwise reexamined in any Court of the United States, than according to the rules of the common law."  U.S. Const. amend. VII.

Defendants argue that allowing the jury to award punitive damages based on the *Engle* findings required the jury to speculate as to what the specific conduct was that formed the basis of the *Engle* jury findings.  Such an endeavor, Defendants argue, violates the Reexamination Clause.  Defendants contrast the

23

compensatory damages award, which was based on the actual, individual harm suffered by Plaintiff as determined by the jury at her trial, with the punitive damages award, which they say required the jury to reassess the *Engle* jury findings in order to decide whether to award any punitive damages, and, if so, how much.

Plaintiff counters that the Seventh Amendment is not implicated by punitive damages awards because "the jury's award of punitive damages does not constitute a finding of 'fact.'" *Cooper Indus., Inc. v. Leatherman Tool Grp., Inc.*, 532 U.S. 424, 437 (2001). Plaintiff points to cases that establish that a court may review a punitive damages award without implicating the Seventh Amendment. *See, e.g., Pac. Mut. Life Ins. Co. v. Haslip*, 499 U.S. 1, 15 (1991) ("Under the traditional common-law approach, the amount of the punitive award is initially determined by a jury instructed to consider the gravity of the wrong and the need to deter similar wrongful conduct. The jury's determination is then reviewed by trial and appellate courts to ensure that it is reasonable.").

Alternatively, Plaintiff argues that, even if the Seventh Amendment is applicable to punitive damages determinations, the jury did not reexamine the *Engle* jury findings. Plaintiff contends that she put on sufficient evidence at trial of Defendants' intentionally tortious conduct for the jury to decide that punitive

24

damages were appropriate and to calculate the award amount. Thus, the jury's punitive damages award did not require the jury to speculate as to the basis for the *Engle* findings.

The Reexamination Clause has been held to prevent second-guessing by successive juries in the contexts of partial retrials and multiple-stage trials like the *Engle* progeny suit here. In *Gasoline Products Company, Inc. v. Champlin Refining Company*, 283 U.S. 494 (1931), the Supreme Court set the standard for what constitutes unconstitutional reexamination in violation of the Seventh Amendment. There, the Court stated that the Reexamination Clause requires that partial retrials "may not properly be resorted to unless it clearly appears that the issue to be retried is so distinct and separable from the others that a trial of it alone may be had without injustice." *Id.* at 500. In that case, the Court addressed an error in the trial court's jury instructions on damages in a breach of contract case. *Id.* at 495–97. The defendant had argued that a partial retrial on damages, without also retrying the issue of liability, would violate the Reexamination Clause. *Id.* at 497. The Supreme Court agreed that, under the circumstances, damages and liability were inseparable because the alleged contract was oral and it was uncertain what the first jury found to be the terms of the contract. *Id.* at 498–500. Thus, because the trial court could not instruct the second jury on the terms of the

25

contract (and how they were breached), the jury would be unable to determine the appropriate compensation without reexamining the first jury's liability determination. *Id.* at 499–500.

This Court has likewise observed that compensatory damages and liability can be so intertwined that retrial on the former without the latter is impossible where there has been a compromised verdict: "one where it is obvious that the jury compromised the issue of liability by awarding inadequate damages." *Burger King Corp. v. Mason*, 710 F.2d 1480, 1486–87 (11th Cir. 1983) (internal quotation marks omitted). Defendants also direct the Court to an unpublished case, *SEB S.A. v. Sunbeam Corporation*, 148 F. App'x 774, 796 (11th Cir. 2005),[5] in which the plaintiff argued that the damages award it received at trial was compromised by the district court's exclusion of evidence relevant to damages. Plaintiff therefore requested a new trial only on the issue of additional damages. We denied the request, reasoning:

> Although any additional award would be based on the same, underlying conduct as the existing award of $6.6 million, we have no way of knowing from the jury's verdict how and in what ways the jury found [the defendant] liable. We can speculate as to the jury's conclusions based on the damages evidence presented by [the plaintiff], but we cannot know for sure.

---

[5] Unpublished cases do not constitute binding authority and may be relied on only to the extent they are persuasive. *United States v. Futrell*, 209 F.3d 1286, 1289 (11th Cir. 2000) (citing 11th Cir. R. 36-2). Because there are so few cases that address the Reexamination Clause, we cite this case only as an example of how the issue has been analyzed.

*Id.* at 797 (footnote omitted).  We further pointed to the fact that "[t]he jury gave no indication of its method of calculating damages, how its damages calculation related to [the defendant's] liability, or any specific finding as to the moment or moments in the [contract's] term on which [the defendant] breached the [contract]." *Id.*  Consistent with *Gasoline Products*, *SEB* followed the rule that instructing a second jury to decide an issue that requires it to speculate about the basis of the first jury's verdict is a prohibited reexamination.[6]

The above caselaw notwithstanding, we have held that liability and compensatory damages are often severable.  *See Mfg. Research Corp. v. Greenlee Tool Co.*, 693 F.2d 1037, 1041–42 (11th Cir. 1982) (observing that "[t]rial of damages alone after liability is an established practice").  For example, when a jury clearly found a defendant liable, but reached unreliable figures for damages because of unclear jury instructions, we granted retrial solely on the issue of

---

[6] This is the same point made by one of the unpublished cases from another circuit relied on by Defendants.  *See Hardman v. AutoZone, Inc.*, 214 F. App'x 758, 765–66 (10th Cir. 2007) (affirming a trial court's order for a full retrial, rather than a retrial only on punitive damages, "because alternative theories of liability were submitted to the first jury and a second jury tasked only with having to determine a new punitive damage award would unfairly be required to speculate as to what . . . conduct formed the basis of the first jury's verdict of liability" (internal quotation marks omitted)).  The other unpublished case relied on by Defendants makes the same point as *Burger King*:  that a second jury cannot be allowed to revisit an earlier jury's findings where the issues are inseparably intertwined.  *See E.E.O.C. v. Stocks, Inc.*, 228 F. App'x 429, 432 (5th Cir. 2007) ("In the discrimination context, a jury's verdict on punitive damages is 'intertwined with its view of the facts determining liability and its award for emotional injury.'" (quoting *Hardin v. Caterpillar, Inc.*, 227 F.3d 268, 272 (5th Cir. 2000))).

27

damages.  *See Overseas Private Inv. Corp. v. Metro. Dade Cty.*, 47 F.3d 1111, 1116 (11th Cir. 1995) ("Because the liability issues were properly and clearly decided by the jury, the remedy in this instance is to remand the case to the district court for a new trial on the amount of damages only.").  Similarly, in *Manufacturing Research Corporation v. Greenlee Tool Company*, 693 F.2d 1037 (11th Cir. 1982), a tortious interference with business relations suit, the defendant objected to the district court's retrial on damages alone, arguing "that no finding was made as to which statements were found by the first jury to be tortious [ ] [and] [o]n retrial the jury was able to assume each incident was tortious and left only to determine causation and damages."  *Id.* at 1041.  We rejected this argument, noting that "[t]he [first] jury specifically found liability.  The repetition of some of the liability evidence, necessary to establish causation, did not render the [second] trial unfair."  *Id.* at 1041–42.

And just as with the separation of liability and damages, a finding that the defendant has been negligent can be severed from a later proceeding that determines the comparative fault between the defendant and the plaintiff.  In ordering the decertification of the *Engle* class, the Florida Supreme Court anticipated and rejected a potential Seventh Amendment challenge.  The court relied on the Fifth Circuit's decision in *Mullen v. Treasure Chest Casino, LLC*, 186

28

F.3d 620 (5th Cir. 1999), to conclude that the separation of the *Engle* defendants' negligence (which had already been decided) from the plaintiffs' comparative negligence (to be decided in the progeny trials) would not implicate the Seventh Amendment, because the question of causation would be left to the progeny juries. *Engle*, 945 So. 2d at 1270 ("[*Mullen*] held that the risk of infringing on the parties' Seventh Amendment rights is not significant and is in fact avoided where the liability issues common to all class members are tried together by a single initial jury, and issues affecting individual class members such as causation, damages, and comparative negligence are tried by different juries."). The Florida Supreme Court did not, however, address any Seventh Amendment implications of its decision to have punitive damages questions reserved for the progeny trials.

## B.    Reexamination of the *Engle* Jury Findings

Applying this framework to the facts at hand, we will assume that the Seventh Amendment applies to a jury's determination to award punitive damages. We also will assume that, depending on the circumstances, the Seventh Amendment could be violated when a second jury is called on to decide punitive damages arising out of a verdict of liability rendered by a previous jury. In this case, however, we find no violation of the Seventh Amendment.

First, we note that the jury here was neither asked nor required to speculate about the *Engle* jury findings in reaching a decision on punitive damages.  On the first day of the trial, the jurors were instructed that "the [*Engle*] findings established only what they expressly state and you must not speculate about the basis for any of the findings."  As to the standard to be applied by the jury in its deliberations, the district court instructed that punitive damages were warranted only if the jury found by clear and convincing evidence that "the fraudulent conduct by defendant causing Carol Lasard's lung cancer death" showed:

> [1] reckless disregard of human life or the safety of the persons exposed to the effect of such conduct . . . [2] an entire lack of care that the defendant must have been conscientiously indifferent to the consequences . . . [3] an entire lack of care that the defendants must have wantonly or recklessly disregarded the safety and welfare of the public . . . [o]r . . . [4] such reckless indifference to the rights of others as to be equivalent to an intentional violation of those rights.

Ultimately, the district court instructed the jury that it would have to consider whether punitive damages were appropriate, "as punishment to that defendant and as a deterrent to others."

In essence, the jury was instructed to focus on Defendant's conduct toward Lasard because it was told that it could award punitive damages only if it found that "the conduct of that Defendant was a substantial cause of Carol La[s]ard's lung cancer and death and that *such conduct* warrants punitive damages."

30

(Emphasis added). In other words, the jury was instructed that any punitive damages award had to be based on the conduct of Defendants that caused Lasard's death. The jury was not asked to speculate about what the earlier *Engle* jury had found, but merely to examine the evidence that had been presented before it at trial to determine whether punishment of Defendants via additional damages was warranted.

Indeed, as a practical matter, absent some proof of the specific conduct of Defendants that warranted punitive damages, the jury arguably would have had no basis or context in which to evaluate Defendant's behavior. That is, if the only evidence Plaintiff had offered up was evidence of Lasard's own smoking history, combined with the general *Engle* verdict finding of some unspecified concealment by Defendants, Defendants might well argue that the jury was necessarily required to reexamine this *Engle* finding, because without this finding there would have been no other evidence available to gauge the egregiousness of Defendant's conduct for purposes of determining punitive damages.

In this case, however, Plaintiff presented evidence supporting a finding that Defendants' conduct warranted punitive damages: specifically, evidence that Defendants had marketed low-tar/low-nicotine cigarettes as healthier and safer than other cigarettes, knowing that this representation was false; that Plaintiff had

31

relied on this representation, which reliance had contributed to her addiction; and that this addiction led to the lung cancer that killed her. Thus, whatever thinking went into the *Engle* jury's conclusion that Defendants had concealed material information—and whether or not the *Engle* jury based its finding of liability on the particular theory urged by Plaintiff—Plaintiff's jury did not have to revisit that first jury's rationale on liability to reach a decision that Defendants' conduct in the case before it warranted punitive damages.

In summary, because we conclude that the jury was not required to speculate about the *Engle* jury findings when it awarded punitive damages, we also conclude that Defendants' Seventh Amendment rights were not violated.

## IV.  COMPARATIVE FAULT

Finally, we address Defendants' objections to the district court's application of the Florida comparative fault statute.  Defendants argue that the district court erred when it refused to apply the jury's comparative fault findings to reduce Plaintiff's damages award in proportion with Lasard's negligence.  First, Defendants argue that the Florida comparative fault statute, Florida Statute § 768.81, required the apportionment of damages because Plaintiff's lawsuit was, in effect, a negligence action.  Second, Defendants argue that even if the statute does not mandate apportionment, apportionment is nonetheless required because

32

Plaintiff waived her right to application of the statute's intentional torts exception through her trial conduct.

## A.    The Comparative Fault Statute

"Florida Statute § 768.81 provides for a reduction of damages in a negligence action for a plaintiff who has herself acted negligently, in proportion to the plaintiff's degree of fault." *Smith v. R.J. Reynolds Tobacco Co.*, 880 F.3d 1272, 1279 (11th Cir. 2018).  Specifically, the statute states that "[i]n a negligence action, contributory fault chargeable to the claimant diminishes proportionately the amount awarded as economic and noneconomic damages for an injury attributable to the claimant's contributory fault."  Fla. Stat. § 768.81(2).  The statute, however, "does not apply . . . to any action based upon an intentional tort."  Fla. Stat. § 768.81(4).

Although when they filed their appeal, Defendants may have had a colorable argument that § 768.81 required apportionment in cases like this where a jury awards a single amount of damages based on both negligence claims and intentional torts, the Florida Supreme Court has since held otherwise.  As our Court recently noted, "the Florida Supreme Court . . . resolved the issue decisively . . . . [and] held that when an *Engle* progeny case contains both negligence and intentional tort claims and when the jury has found for the plaintiff on an

33

intentional tort claim, then the compensatory damages award cannot be reduced based on the plaintiff's percentage of fault." *Smith*, 880 F.3d at 1280 (discussing *Schoeff v. R.J. Reynolds Tobacco Co.*, 232 So. 3d 294 (Fla. 2017)); *see also Burkhart*, 884 F.3d at 1086–87 (same).  So, taken by itself, § 768.81 does not permit apportionment here.

## B.    Waiver

Accordingly, Defendants' only potentially viable argument is that Plaintiff waived any right to unapportioned damages she might have under § 768.81.[7]  *See Smith*, 880 F.3d at 1280 (acknowledging that the Florida Supreme Court has left open the possibility that § 768.81's intentional tort exception can be waived). Specifically, Defendants argue that at trial Plaintiff took the position that comparative fault would apply, only to abandon that position at the conclusion of the trial.

The parties disagree over whether federal or Florida law governs the waiver analysis here.  At the very least, they agree that federal law generally governs

---

[7] Defendants also suggest that the doctrine of judicial estoppel might apply.  In diversity cases, "the application of the doctrine of judicial estoppel is governed by state law." *Original Appalachian Artworks, Inc. v. S. Diamond Assocs., Inc.*, 44 F.3d 925, 930 (11th Cir. 1995). Under Florida law, judicial estoppel applies only when a party maintains inconsistent positions in separate proceedings.  *See Fintak v. Fintak*, 120 So. 3d 177, 186–87 (Fla. 2d DCA 2013) ("[T]he party against whom estoppel is sought must have asserted a clearly inconsistent or conflicting position in a prior judicial proceeding." (citing *Blumberg v. USAA Cas. Ins. Co.*, 790 So. 2d 1061, 1066 (Fla. 2001))).  So judicial estoppel does not apply to inconsistent positions taken in the course of a single trial.  For that reason, judicial estoppel cannot apply here.

waiver in diversity cases. *Morgan Guar. Tr. Co. of N.Y. v. Blum*, 649 F.2d 342, 344 (5th Cir. Unit B July 1981) ("In diversity of citizenship actions, state law defines the nature of defenses, but the Federal Rules of Civil Procedure provide the manner and the time in which defenses are raised and when waiver occurs."); *see also Proctor v. Fluor Enters., Inc.*, 494 F.3d 1337, 1350 (11th Cir. 2007) (same). Plaintiff argues that this general rule holds true here, but Defendants believe an exception to the general rule applies. Both parties cite in support of their position the Seventh Circuit's opinion in *Herremans v. Carrera Designs, Inc.*, 157 F.3d 1118 (7th Cir. 1998). *Herremans* recognized that, "in general . . . it is those [federal] principles, not state-law principles, which, like other procedural rules, govern federal litigation even when the basis of federal jurisdiction is diversity of citizenship." *Id.* at 1123 (citations omitted). However, the court continued:

> There is an exception for cases in which the application of the federal rule would interfere with substantial state interests, and the exception is more likely to be applicable when the state waiver rule is limited to some particular body of substantive law and is therefore more likely to reflect state substantive policies than is a procedural rule of general applicability.

*Id.* (citations omitted).

Ultimately, we need not decide which law governs because, under either, Plaintiff did not waive the intentional tort exception. Under both federal and Florida law, we review the district court's waiver determination for abuse of

35

discretion. *Proctor*, 494 F.3d at 1350; *Schoeff v. R.J. Reynolds Tobacco Co.*, 232 So. 3d 294, 305 (Fla. 2017). The general framework for waiver under federal and Florida law are also substantially similar. Under federal law, "[w]aiver is the voluntary, intentional relinquishment of a known right." *Glass v. United of Omaha Life Ins. Co.*, 33 F.3d 1341, 1347 (11th Cir. 1994). Florida law is, for our purposes here, the same. *See Major League Baseball v. Morsani*, 790 So. 2d 1071, 1077 n.12 (Fla. 2001) ("Waiver is the voluntary and intentional relinquishment of a known right, or conduct which implies the voluntary and intentional relinquishment of a known right.").

Defendants first point to Plaintiff's complaint, which does not explicitly state that the intentional torts exception to the comparative fault statute should apply. The Second Amended Complaint states that Plaintiff "seeks compensatory and punitive damages in accordance with the Florida Wrongful Death Act, the Florida Survival Statute and with the Florida Supreme Court's class action decision and mandate in *Engle*." The complaint references comparative fault only in very general terms. It says that, because *Engle* resolved many issues of liability and general causation, Plaintiff "brings this action upon the limited remaining issues in dispute, to-wit: specific causation, apportionment of damages, comparative fault,

36

compensatory damages, entitlement to punitive damages, and punitive damages."

The complaint further states:

> The Decedent's actions in using Defendant's [*sic*] cigarettes as marketed and intended by Defendants, and related to the frequency, duration and manner of Decedent's efforts to cease smoking, should be considered by the jury along with Defendants' acts and omissions for purposes of determining whether the Decedent's acts or omissions rise to the level of negligence and constitute comparative fault.

There are no further mentions in the complaint of comparative fault or how it should apply.

We do not interpret the complaint's mention of comparative fault as a voluntary and intentional relinquishment of the right to unapportioned damages should Plaintiff prevail on the intentional torts, because the legal implications of prevailing on those claims are not discussed. Defendants, moreover, point to no obligation on Plaintiff's part to affirmatively state that comparative fault would not apply if she should prevail on the intentional torts. Neither the federal nor Florida rules of civil procedure require such statements in the pleadings. *See* Fed. R. Civ. P. 8(a) (requiring "(1) a short and plain statement of the grounds for the court's jurisdiction . . . (2) a short and plain statement of the claim . . . and (3) a demand for the relief sought"); Fla. R. Civ. P. Rule 1.110 (requiring "(1) a short and plain statement of the grounds upon which the court's jurisdiction depends . . . (2) a

37

short and plain statement of the ultimate facts showing that the pleader is entitled to relief, and (3) a demand for . . . relief").

Defendants also cite portions of the trial transcript where Plaintiff admits that Lasard shared some fault for her death.  For instance, in her opening statement, Plaintiff "admit[ted] Carol Lasard's actions should be judged, just like the cigarette companies' actions should be judged."  But she followed by saying that Lasard "is not at all responsible for the cigarette companies' lies, for their fraud and their conspiracy.  The cigarette companies are 100 percent responsible for that.  In fact, you will see, those are two totally separate questions on your verdict form."  And Plaintiff made the exact same point later in her closing argument:  that although Lasard may have borne some fault based on her own negligence in continuing to smoke, she bore no responsibility for Defendants' acts of concealment.  This argument suggests that Plaintiff did not envision a reduction of damages based on her mother's fault on the concealment claims.

Turning to the jury instructions, Defendants seem to misread the very jury instructions they cite.  Defendants quote the district court's instruction that, "[t]he Court will prepare the judgment to be entered and will reduce plaintiff's total damages as required by law."  Defendants focus on the words "will reduce" but neglect the phrase "as required by law."  That said, the above language is

38

admittedly somewhat cryptic and does not clearly communicate to the jury that the damages award will not necessarily be reduced based on the jury's assessment of fault. That is, a jury could understand "as required by law" to be a qualifying phrase that means the court will reduce plaintiff's total damages "only if required by law," suggesting to the jury that there may be some uncertainty whether the damages will be reduced based on a finding that Plaintiff is partially responsible for her own injuries. On the other hand, the jury could arguably understand the word "as required by law" to mean "which is required by law." That interpretation would prompt the jury to conclude that its proportional assessment of fault would be dispositive and require a reduction in plaintiff's total damages. A jury's assessment of the proper amount of damages could be impacted by the particular interpretation it gives to this particular instruction.

Plaintiff, however, anticipated and attempted to ameliorate this ambiguity. Plaintiff's proposed jury instructions included an instruction that "[u]nder the law, some claims are subject to reduction due to the fault of the claimant and others are not." Plaintiff explained:

> What defendants have done on some occasions is argue that if we have not explained that [comparative fault does not apply to the intentional tort claims] very clearly to the jury in opening and closing and throughout the case or even explained it clearly in the jury instructions or the verdict form, that somehow we have waived Florida law that comparative fault does not apply to the intentional

39

tort.  <u>So we would seek language in here that explains that the recovery or award will be reduced by your Honor under Florida law and that some -- and specifically state that, you know, certain claims of plaintiff would be reduced for comparative fault and some claims, the intentional torts, would not be reduced</u> and your Honor would take care of that under Florida law.

(Emphasis added).

The court responded, "I mean, I don't make the distinction that you are requesting, but I'm saying that I will make the allegations."  To this, Plaintiff responded, "Correct, your Honor.  And we assume you will make it under Florida law.  Comparative fault does not apply to the fraud and conspiracy claim."

Later in the hearing, Plaintiff again reiterated that "this is a[n] issue of waiver and whether or not we waive it."  To this, the court recognized, "you are preserving -- you're not waiving.  I understand that.  I think the record will reflect that."  And again in the hearing, the court stated to Defendants that "for purposes of the jury instructions, they are not construing the giving of this instruction as a waiver."  As Plaintiff's counsel later argued to the district court, in her understanding of the instructions, they "make[ ] clear that the judge will reduce as required by law.  So it doesn't say 'will reduce.' It says 'as required by law.'"  The court recognized this and explained that, by giving a less definite instruction, it was merely recognizing that the parties disputed the applicability of the comparative

40

fault statute, and that the court would decide which interpretation was correct after the verdict.

In the end, though, it was Defendants who were responsible for the jury instruction in question, with Defendants having persuaded the district court that Plaintiff's clarification should <u>not</u> be made to the jury.[8]  Thus, Defendants cannot be heard to now complain about jury confusion that may have resulted from the giving of that charge.

As to whether Plaintiff waived anything, in rejecting Defendants' post-verdict request that damages be reduced based on the jury's assessment of fault, the district court held that Plaintiff had not waived her right to avoid comparative fault reduction through the jury instructions.  We agree.  The district court's conclusion is supported by the record, as described above.  Plaintiff clearly communicated her intent not to not waive her right to unapportioned damages and offered a means whereby the court could clarify to the jury that its decision to apportion fault might not necessarily result in a reduction of the damages. Defendants could not have been caught off-guard by Plaintiff's post-verdict request that damages not be reduced.

---

[8]  At the charging conference, Plaintiff, as described above, pushed for an instruction to clarify for the jury that the damages for the intentional torts would not be reduced by comparative fault. In response, Defendants asserted that they "disagree[d] with that as a matter of Florida law" because "comparative fault applies to the case as a whole regardless of what particular claim . . . whether [the jury] finds yes or no on intentional torts versus non-intentional torts."

41

The Florida cases cited by Defendants in support of their waiver argument do not suggest otherwise. We have recognized that, in the context of *Engle* progeny cases, it can be "fairly infer[red]" from the Florida Supreme Court's opinion in *Schoeff v. R.J. Reynolds Tobacco Company*, 232 So. 3d 294 (Fla. 2017), "that the [Florida Supreme Court] is not keen on the notion of waiver." *Smith*, 880 F.3d at 1282. Indeed, in *Schoeff*, the Florida Supreme Court, addressing similar conduct, held that a trial court abused its discretion when it held that an *Engle*-progeny plaintiff had waived the intentional tort exception by arguing comparative fault on her negligence claims.[9] 232 So. 3d at 306. As described above, that is what Plaintiff did here.

Accordingly, we hold that Plaintiff did not waive her statutory right to unapportioned damages, and she is entitled to the full compensatory damages (post-remittitur) that the district court awarded her.

## V.    CONCLUSION

---

[9] In doing so, the Florida Supreme Court also overruled *R.J. Reynolds Tobacco Company v. Hiott*, 129 So. 3d 473 (Fla. 1st DCA 2014)—an opinion relied on by Defendants—"to the extent [*Hiott*] held that the intentional tort exception is waived when an *Engle* progeny plaintiff argues comparative fault on the negligence counts." *Schoeff*, 232 So. 3d at 306. The other case relied on by Defendants—*R.J. Reynolds Tobacco Company v. Sury*—upheld a trial court's determination that the plaintiff had not waived the intentional tort exception and does not establish what sort of conduct would constitute waiver. 118 So. 3d 849, 851–52 (Fla. 1st DCA 2013). For this reason, *Sury* is not instructive here.

42

We reject Defendants' due process arguments because, as we held in *Walker*, *Graham*, and *Burkhart*, the use of the *Engle* findings to establish the conduct elements of the progeny plaintiffs' tort claims is a constitutionally permissible application of res judicata.  We reject Defendants' assertion that their Seventh Amendment rights were violated because we conclude that the jury was not asked or required to reexamine the *Engle* findings.  Finally, because the district court neither misinterpreted nor misapplied Florida law and Plaintiff did not waive her statutory right to full, unapportioned damages, we reject Defendants' assertion that the damages award should have been apportioned based on Lasard's comparative fault.  For these reasons, we **AFFIRM** the district court.

MARTIN, Circuit Judge, concurring:

My approach to the question of whether giving preclusive effect to the Engle jury's fraudulent-concealment and conspiracy-to-fraudulently-conceal findings violates due process is different from that of the Majority.[1]  I write separately for that reason.  In Graham v. R.J. Reynolds Tobacco Co., 857 F.3d 1169 (11th Cir. 2017) (en banc) our court held that giving preclusive effect to the Engle jury's negligence and strict liability findings did not violate due process.  Id. at 1174.  I recognize that the fraudulent-concealment and conspiracy-to-fraudulently-conceal findings that we address here were not considered by our en banc court in Graham. Even so, I view the reasoning of Graham to foreclose any due process challenge to Engle's concealment findings, just as it did for Engle's negligence and strict liability findings.  It was for that reason that I dissented from my colleagues' decision, over seven months ago, to order supplemental briefing following this Court's decision in Graham.  And also for that reason, I continue to disagree with the Majority's description of the questions presented in this case after Graham was decided.  See Maj. Op. at 16–23.

---

[1] I join the Majority's holdings that the punitive damages award did not violate the Seventh Amendment Reexamination Clause and that the District Court correctly declined to reduce Ms. Searcy's damages under Florida's comparative fault statute.

44

Our divergent views stem from our disagreement about how <u>Graham</u> decided the due process issue.  The Majority says <u>Graham</u> held that due process was satisfied only after the court conducted an exacting, <u>de novo</u> review of the <u>Engle</u> trial record to determine what was "actually decided" by the <u>Engle</u> jury.  Maj. Op. at 21–22; <u>see</u> <u>Graham</u>, 857 F.3d at 1182–83.  But to the contrary, <u>Graham</u> actually held that the Florida Supreme Court's rulings about what the <u>Engle</u> jury decided were due full faith and credit.

Before <u>Graham</u> said anything about the trial record, the opinion first reviewed the Florida Supreme Court's decisions in <u>Engle v. Liggett Group, Inc.</u>, 945 So. 2d 1246 (Fla. 2006), and <u>Philip Morris USA, Inc. v. Douglas</u>, 110 So. 3d 419 (Fla. 2013).  It concluded "[t]he Florida Supreme Court made clear in <u>Douglas</u> that the <u>Engle</u> jury decided common elements of the negligence and strict liability of the tobacco companies for all class members."  <u>Graham</u>, 857 F.3d at 1182.  After it discussed these decisions of the Florida Supreme Court, <u>Graham</u> then referenced the <u>Engle</u> trial record in order to apply those Florida Supreme Court rulings, not to conduct a <u>de novo</u> review of what had been decided by the <u>Engle</u> jury.  <u>Graham</u>, 857 F.3d at 1182–83.  The en banc court concluded that, "[a]fter reviewing the <u>Engle</u> trial record, <u>we are satisfied that the Florida Supreme Court determined</u> that the <u>Engle</u> jury found the common elements of negligence and strict

45

liability against Philip Morris and R.J. Reynolds." Id. at 1182 (emphasis added); see also id. at 1183 ("The only way to make sense of these proceedings is that the Florida courts determined that the Engle jury actually decided issues common to the class . . . ."). Then in its final paragraph on the due process issue, Graham makes clear its holding derived from giving full faith and credit to the Florida Supreme Court's decision in Engle. On that point, our en banc court stated, "We do not give full faith and credit to the decision in Douglas; we instead give full faith and credit to the jury findings in Engle. The Florida Supreme Court in Engle interpreted those findings to determine what the jury actually decided . . . ." Graham, 857 F.3d at 1185. This summary underscores that the holding in Graham rests on giving full faith and credit to the judgment of the Florida Supreme Court.

In addition to what Graham said about it, giving full faith and credit to Florida's highest court is consistent with this Court's prior precedent in Walker v. R.J. Reynolds Tobacco Co., 734 F.3d 1278, (11th Cir. 2013). And of course, Graham expressly "reaffirm[ed]" Walker. Graham, 857 F.3d at 1174. In Walker, a panel of this Court stated:

> If due process requires a finding that an issue was actually decided, then the Supreme Court of Florida made the necessary finding when it explained that the approved findings from Phase I "go to the defendants underlying conduct which is common to all class members and will not change from case to case" and that "the approved Phase I

46

findings are specific enough" to establish certain elements of the plaintiffs' claims.

Walker, 734 F.3d at 1289 (quoting Douglas, 110 So. 3d at 428).  Read together, Walker and Graham do not require a de novo review of the trial record to determine what the Engle jury decided.

It is for these reasons that I do not endorse the Majority's description of the threshold question facing us in this case after Graham.  See Maj. Op. at 18–23.[2] Under Graham, our job is only to determine whether the Florida courts had ruled that the Engle jury actually decided the common elements of fraudulent concealment and conspiracy to fraudulently conceal for all class members. Because the Florida Supreme Court has so held, this analysis should have been straightforward.  See Graham, 857 F.3d at 1182 (summarizing the Florida Supreme Court's ruling that "the Phase I findings establish the causal link between the tobacco companies' conduct and the class members' injuries because the companies acted wrongfully toward all of the class members").

—————————

[2] I agree with the Majority that "a state proceeding is only entitled to full faith and credit if it complies with due process."  Maj. Op. at 18 n.5.  But Graham held that the Engle jury findings were due full faith and credit because the Florida courts had found the Engle jury "actually decided" those issues.  Graham, 857 F.3d at 1185. It strikes me as strong medicine for the majority to say that I "mischaracterize" Graham, especially since I am the only member of this panel who was a signatory to the majority opinion in Graham.  As such, I merely state my understanding of the opinion I participated in.  And if the Majority thinks we should second guess the Florida courts' judgment in that regard, I understand their approach as being inconsistent with Graham.

I arrive at the same result reached by the majority, although at least in part, by a different route.

48